**UNITED STATES of America, Plaintiff,**

v.

**Richard Dean McARTHUR.***

**Crim. No. Cl–75–27 to Cl–75–34.**

United States District Court,
D. North Dakota,
Southwestern Division.

Oct. 17, 1975.

As Amended June 23, 1976.

* Consolidated Cases are:
United States of America v. Melvin Lee Houston, S.Dak. No. 73–5037, N.Dak. No. Cl–75–28; v. John Milford Thomas, S.Dak. No. 73–5038, N.Dak. No. Cl–75–29; v. Christopher Oliver Land, S.Dak. No. 73–5041, N.Dak. No. Cl–75–30; v. Lawrence Anthony Tennecour, S.Dak. No. 73–5045, N.Dak. No. Cl–75–31; v. Richard J. Garnier, S.Dak. No. 74–5061, N.Dak. No. Cl–75–32; v. Geneva Red Feather, S.Dak. No. 73–5176, N.Dak. Cl–75–33; v. Sioux Casper, S.Dak. No. 73–5177, N.Dak. No. Cl–75–34; v. Martina Ellen White Bear, S.Dak. No. 73–5177, N.Dak. No. Cl–75–34; v. Joseph Bill, S.Dak. No. 73–5177, N.Dak. No. Cl–75–34.

Keith E. Uhl, Sp. Asst. U. S. Atty., Des Moines, Iowa, for plaintiff.

Kenneth Tilsen, St. Paul, Minn., Joseph Beeler, Miami, Fla., for defendants.

VanSICKLE, District Judge.

The Defendants have been indicted for attempting to interfere with United States Marshals and Federal Bureau of Investigation agents at Wounded Knee, South Dakota, during occupation of that village by American Indian Movement members or supporters.

Trial has been set to the Court on a stipulated set of facts. Transfer of the cases to the District of North Dakota was at the request of the Defendants, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure.[1]

---

1. Certain issues in these very cases have already been presented to and ruled on by Judge Bogue in South Dakota before they were transferred here. Judge Bogue partially granted the government's motions in limine in all these cases regarding the "posse comitatus" issue. See *United States v. Red Feather*, 392 F.Supp. 916 (D.S.D.1975). Judge Bogue denied the motions of the respective Defendants that the charges against them be dismissed on grounds of collateral estoppel. Since these very issues are now presented to me for redetermination, I deem it appropriate to state that counsel for the government and for the Defendants have

The indictments are under 18 U.S.C. § 231(a)(3), which states:

"Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—

Shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The government recognized that these Defendants, if guilty, were guilty under that portion of the statute which addresses itself to attempts.

■ In order to find any of the Defendants guilty, it is necessary that the government establish beyond a reasonable doubt each and all of the following essential elements:

1. That a civil disorder existed at the time of any alleged violation;

2. That such civil disorder was resulting in interference with a federally protected function;

3. That one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder;

4. That the Defendant attempted to commit an act for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, in a violent manner with such law enforcement officer or officers;

5. That such attempt to act was done willfully and knowingly.

See *United States v. Jaramillo,* 380 F.Supp. 1375, 1376, (D.Neb.1974), *appeal dismissed,*

510 F.2d 808 (8th Cir. 1975); *United States v. Banks-Means,* 383 F.Supp. 368 (D.S.D. 1974); *United States v. Red Feather,* 392 F.Supp. 916 (D.S.D.1975).

I find that at all times material to the issues in this case:

1. That a civil disorder existed, and

2. That such civil disorder was resulting in interference with a federally protected function.

As to: Cl–75–27 Richard Dean McArthur

Cl–75–28 Melvin Lee Houston

Cl–75–29 John Milford Thomas

Cl–75–31 Lawrence Anthony Tennecour

They were arrested March 8, 1973, approximately 200 yards southwest of Roadblock No. 3. Thomas, Tennecour, and Houston attempted to flee after the initial order to halt. The four men, among themselves, had three shotguns and a .22 caliber rifle. They either gave no statements or gave statements indicating that they were simply in the area to see what was going on. None of the Defendants were residents of Wounded Knee. Tennecour indicated he had lived in Rapid City for about a month, but the residences of the other three are not established.

■ Do these facts establish an "attempt to obstruct" under the statute? The fact of an abortive attempt to flee is evidence pointing to guilt, but it, standing alone, is at best equivocal evidence. The fact that each carried a rifle or shotgun is again evidence, but at best equivocal. Both weapons are normal arms for people in that area to possess and to carry. And the evidence does not help me to decide whether the non-resident three were experienced in reservation life and reservation ways, and thus accustomed to weapons.

That the situation would draw the idle curious, and even idle curious who would arm themselves for self-defense or whatever, is understandable when we remember

agreed to this course of action. Given the transfer of the entire case, I conclude that on those matters I have before me a joint motion

for reconsideration of those motions previously ruled on by Judge Bogue.

that on March 8, 1973, the civil disorder was only nine days old and receiving an increasing crescendo of news media exploitation.

Thus, I find that the proof as to these Defendants is equivocal, and the felony charge is not proved beyond a reasonable doubt.

Accordingly, these Defendants will be acquitted.

As to: Cl–75–33 Geneva M. Red Feather
Cl–75–34 Joseph Bill
Martina Ellen White Bear
Sioux Casper

On April 25, 1973, these four persons were arrested by Bureau of Indian Affairs Patrolmen, about one and one-half miles northeast of Roadblock No. 5. At the time of arrest the persons were concealing themselves by lying in the grass. At the time of the arrest they had on or near their persons:

1 sealed tin of 800 rounds, 7.62 millimeter cartridges;

1 bolt action, 12 gauge shotgun with two shells in the magazine;

1 M1 Carbine, .30 caliber, Serial No. 7845, containing two magazines taped together with twenty-nine, .30 caliber rounds in each magazine and one .30 caliber round in the chamber.

1 cartridge belt containing eleven 12 gauge shotgun shells;

1 military type jacket containing several hundred .30 caliber cartridges;

1 cartridge belt containing twenty 12 gauge shotgun shells;

1 box containing six hundred nineteen .30 caliber cartridges.

Geneva M. Red Feather indicated she was attempting to walk into Wounded Knee for the purpose of transporting the guns and ammunition into Wounded Knee.

As to: Cl–75–32 Richard John Garnier

On March 20, 1973, at a point about 300 yards southeast of Roadblock No. 5, Federal Bureau of Investigation Agents arrested the Defendant and another person, after being alerted by an exchange of whistle sounds in the area. At the time of his arrest, Garnier had food and cigarettes near him and was armed with a .22 caliber rifle which had fourteen rounds in the magazine. Garnier indicated that he intended to take the supplies and rifle into Wounded Knee. He also stated several times, somewhat grandiloquently, that "I have come here to die anyway."

As to: Cl–75–30 Christopher Oliver Land

On March 10, 1973, the Defendant was arrested by Deputy United States Marshals patrolling between Roadblocks 4 and 8. (8 is not shown on the Court's exhibit.) At the time of his arrest, he had:

4 boxes of .22 caliber ammunition;

6 knives, not described further;

1 package of fireworks;

2 matchboxes containing several rounds of .22 ammunition.

The Defendant stated that he wanted to enter Wounded Knee in order to assist the Indians.

Defendants argue that since their conduct was interrupted, it remained in the stage of "preparation" and failed to amount to an "attempt." That was the English common law doctrine, but it is not the American common law doctrine. In the United States, the accused has been held to have passed "preparation" although he was interrupted before he took the last of his intended steps. Justice Holmes had discussed this problem in two Massachusetts cases while he was on the appellate bench. See cases cited in *United States v. Coplon,* 185 F.2d 629 (2nd Cir. 1950). Justice Holmes enlarged on the discussion in Holmes—The Common Law, p. 65 through p. 69. Justice Holmes said:

"Public policy, that is to say, legislative considerations, are at the bottom of the matter; the consideration being in this case, the nearness of the danger, the greatness of the harm, and the degree of apprehension felt."

█ I find that these Defendants did carry, on foot, surreptitiously, through a patrolled perimeter, arms and ammunition which had a substantial capacity to reach out and wound or kill. I find that they

intended it for a center from which ammunition was being fired at law enforcement officers, which did wound. That is sufficient conduct to amount to an attempt.

■ The evidence also establishes the 4th and 5th elements of the crime; that is, the requisite, specific intent as to each Defendant.

18 U.S.C. § 231(a)(3) provides further the law enforcement officer who is the victim of the interference must be:

". . . lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder . . . ."

Defendants urge that these law enforcement officers were not "lawfully engaged in the lawful performance of their official duties" because they received assistance in violation of the Posse Comitatus Act, 18 U.S.C. § 1385. The Posse Comitatus Act provides:

"Whoever, except in cases . . . expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined . . . or imprisoned . . . , or both."

Defendants argue that as part of the government's case, it must prove beyond a reasonable doubt that the law enforcement officers were "lawfully engaged in the lawful performance of their official duties," and that evidence of assistance in advice, personnel, and materiel by the military to the law enforcement officers, raises a question of whether the posse comitatus act was

violated, thus raising a reasonable doubt on that issue.

■ Again, the third element of the crime charged, which the government must prove beyond a reasonable doubt is:

"3. That one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder;"

*United States v. Jaramillo,* supra, at p. 1376.

Or as Judge Urbom restated it:

". . . it is incumbent upon the court as fact finder to decide as a factual matter whether the performance of their duties by the law enforcement officers was lawful. More than that, the burden is upon the prosecution, before the defendants can be found guilty, to prove to the fact finder beyond a reasonable doubt that the performance was lawful."

*United States v. Jaramillo,* supra, at p. 1381.

The evidence on the posse comitatus issue comes to me by stipulation, from the transcripts of *United States v. Banks-Means,* supra, and *United States v. Jaramillo,* supra. Judge Nichol made his decision on certain evidence. Judge Urbom made his decision on the evidence available to Judge Nichol, plus additional evidence. Judge Bogue and I, in turn, have had available the evidence presented to Judge Urbom.

Since different decisions were reached upon the same evidence, I include as footnote 2,[2] the statement of evidence as drawn

---

2. Colonel Volney Warner, Chief of Staff of the 82nd Airborne Division of the United States Army, was ordered to the Pine Ridge Reservation on March 2, 1973, and arrived there in the early morning of March 3. Colonel Jack C. Potter, Deputy Chief of Staff of Logistics of the 6th United States Army, was directed also to the Pine Ridge Reservation and arrived on March 3. Colonel Warner's primary role was to observe conditions and developments at Wounded Knee for the purpose of advising the Department of Defense as to whether federal troops should be used at Wounded Knee. He constantly advised against the commitment of federal troops. He gave advice to Department

of Defense officials regarding whether specific requests for military supplies and equipment by the Department of Justice should be approved, and no such requests were approved by the Department of Defense without Colonel Warner's approval. However, he did more than observe and advise the Department of Defense. He counseled Department of Justice officials on the scene to substitute a shoot-to-wound policy for a then-existing shoot-to-kill policy, and suggested the use of other Rules of Engagement which were a part of a military contingency plan for civil disorders. These Rules of Engagement, including the shoot-to-wound features, were adopted by Department

by Judge Urbom; and as footnote 3,[3] the statement of the evidence as drawn by Judge Bogue.

Judge Bogue analyzed the evidence to find whether there was a "direct active use" of any unit of federal military troops of whatever size, even if it be one single soldier, *United States v. Red Feather,* supra, p. 922. He found no evidence of such direct, active use. He found, therefore, that the evidence offered was peripheral, not relevant, and denied its admission.

Judge Urbom analyzed the evidence to determine whether a "use of any part of the Army or Air Force *pervaded* the activities of the United States Marshals and the Federal Bureau of Investigation agents." *United States v. Jaramillo,* supra, p. 1379 and 1380. He felt that as a trier of fact, he could not find that the third element of the crime had been established beyond a reasonable doubt; therefore, the defendants had to be acquitted.

Neither test is quite satisfactory to me. History tells us that Americans are suspicious of military authority as a dangerous tool of dictatorial power—dangerous, that is, to the freedom of individuals.

 It is the nature of their primary mission that military personnel must be trained to operate under circumstances where the protection of constitutional free-

---

of Justice personnel, including the Federal Bureau of Investigation and the United States marshals. He urged negotiations with the occupiers of the village. When a request was made by law enforcement officers on the scene for armored personnel carriers to be stationed at each of the seven or eight roadblocks which surrounded Wounded Knee, Colonel Warner would recommend and did recommend approval of the request only upon the condition that assurance be given by the law enforcement officers that the armored personnel carriers would be used only defensively, that the perimeter of the roadblocks would not be tightened, that the armored personnel carriers would not be moved more than 100 meters in any direction, except after dark, and that no effort would be made to aggravate or encourage anybody to attack. These restrictions were acceded to by the Department of Justice officials, including the Director of the Federal Bureau of Investigation and the Director of the United States Marshal Service, and orders to the Federal Bureau of Investigation agents and United States marshals were made on the basis of such restrictions.

Colonel Warner also requested, almost immediately upon his arrival, that he be given help with logistics, and Colonel Potter came as a response to that request. Colonel Potter's primary role was to keep an inventory of the military supplies and equipment furnished for the Wounded Knee operation and to use his knowledge and expertise advising the Department of Defense of the availability and location of requested supplies and equipment.

Additionally, at least one aerial reconnaissance was made by the Nebraska National Guard, using National Guard Personnel for the flight, at the request of the Federal Bureau of Investigation and the United States Marshal Service. Also, South Dakota National Guard mechanics were sent to the vicinity of the Res-

ervation for repairing and maintaining the armored personal carriers.

Instructions to the Federal Bureau of Investigation, the United States marshals, and the Bureau of Indian Affairs personnel who manned the roadblocks, patrolled the areas between the roadblocks, and used the equipment and supplies furnished by the Army, were given only by the officials of the Department of Justice and Department of Interior, not by officials of the Department of Defense, which included the Army and the Air Force.

Colonel Warner, Colonel Potter, the personnel who repaired and maintained the unarmed armored personnel carriers, and the personnel who flew the one or more reconnaissance missions, were "any part of the Army or Air Force."

*United States v. Jaramillo,* supra, at p. 1379

3. The evidence of military involvement contained in the transcripts, in essence, falls into the following categories: use by federal civil law enforcement officers of material and equipment furnished by the United States Army and the South Dakota National Guard; the presence of United States Army personnel who were ordered to Wounded Knee to observe and report to the President through the Department of Defense the necessity of calling in federal troops; the drafting by military personnel of contingency plans to be used by the United States Army in the event that federal military intervention was ordered by the President; aerial photographic reconnaissance service provided by the United States Air Force and the Nebraska National Guard; the advice, urging and counsel given by the United States Army personnel to Department of Justice personnel on the subjects of negotiations, logistics and rules of engagement; and the maintenance of military vehicles performed by members of the Nebraska National Guard.

*United States v. Red Feather,* supra, at p. 921.

194

doms cannot receive the consideration needed in order to assure their preservation. The posse comitatus statute is intended to meet that danger. But the posse comitatus statute must be interpreted in the light of the statutory framework which surrounds it. Specifically, I refer to 31 U.S.C. § 686, the Economy Act, authorizing any department or agency of the government to "place orders" for materials, supplies, equipment, *work* or *services* of any kind that the requisitioned federal agency may be in a position to supply.

It would seem on the face of things that the borrowing of highly skilled personnel, like pilots and highly technical equipment like aircraft and cameras, for a specific, limited, temporary purpose is far preferable to the maintenance of such personnel and equipment by the United States Marshals' Service.

Judge Urbom's standard of use of the military "pervading" the activities of the civilian law enforcement officer, represents an approach well established in constitutional law. Sometimes the reference is to "chilling effect", but the cases do recognize that governmental action may be subject to "constitutional" challenge even though it has only an indirect effect. See *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), 408 U.S. at p. 11, 92 S.Ct. 2318.

However, my concern with Judge Urbom's analysis is that I feel his rule requires a judgment be made from too vague a standard. At the same time, my concern with Judge Bogue's analysis is that it is too mechanical, and inevitably when the rule is applied to borderline cases, it will crumble at the edges.

 Returning to the posse comitatus statute with its mandate against the use of a part of the Army or Air Force to "execute" the law; "execute" implies an authoritarian act. I conclude that the feared use which is prohibited by the posse comitatus statute is that which is regulatory, proscriptive or compulsory in nature, and causes the

citizens to be presently or prospectively subject to regulations, proscriptions, or compulsions imposed by military authority.[4]

So, here, the standard I apply is this:

Were Army or Air Force personnel used by the civilian law enforcement officers at Wounded Knee in such manner that the military personnel subjected the citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature, either presently or prospectively?

If the evidence adduced does raise that question of fact, then the government has failed to prove the third element of the offense. If not, then the third element of the offense stands established by the prima facie lawfulness of the performance of their duties by federal government officials as provided for in 18 U.S.C. § 3052 and § 3053.

 I find that the evidence of military activity is admissible as going to the question of the government's proof of the third element of the crime.

However, applying the standard used by me, I do not reach the same conclusion as Judge Urbom for these reasons: True, the military men, Colonel Warner and Colonel Potter and related maintenance assistants, were present without the Presidential mandate provided for in 10 U.S.C. § 331 and § 332. Defendants saw in this an attempt to evade the posse comitatus statute by President Nixon and related it vaguely to "Watergate". But the only testimony on the point was to the effect that the responsible government representatives followed a deliberate policy not to exacerbate the situation by causing a confrontation between the military and the citizens, and particularly the military and the Indian people.

The cases above cited concur in the reasoning that the furnishing of material and supplies do not involve the posse comitatus statute. True, Colonel Warner had an inflated concept of his function and duties, as shown by his self-laudatory after-action re-

---

4. The inspiration for this language may be found in the decision of Chief Justice Burger in *Laird v. Tatum,* supra.

port, and his testimony that he had a vote in final policy decisions. But Colonel Warner's assertions were not borne out by the rest of the testimony. He did furnish expert tactical advice of immeasurable value. But I find, and feel I differ with Judge Urbom on this point, that the government policy of loaning equipment between branches of the government extends to the loaning of expert advisors, as was done here. That is, to my mind, Colonel Warner was borrowed as a vehicle might be borrowed. And the evidence clearly showed that Colonel Warner and Colonel Potter had another principal duty, that of being prepared to "use a part of the Army or Air Force to execute the laws" if the President should determine that was necessary. This preparation for a possible future military act by responsible military men cannot be equated to the actual use by civilian authorities of a part of the Army or Air Force to execute the laws.

In evaluating the reasonableness of a request by civilian law enforcement officers for expert advice, it must be remembered that this civil disorder was occurring in open country, and the movement of substantial numbers of civilian officers in that situation is a matter about which army personnel are peculiarly versed.

Finally, as Judge Urbom points out in his statement of the third element of the crime:

"3. That one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties . . . ."

How does the advice of Warner to the Chief Marshal pervade performance by a Marshal, at a check point, of his duties? The order to shoot to wound, not to kill was given him by his superior, not by Warner. In fact, Warner gave no orders. Warner recommended restraints be imposed on the use of military supplies and equipment, but those restraints had to be imposed by the order of the civil authorities.

■ Thus, I do find that while the evidence of "use of any part of the Army or Air Force" is relevant to the issue of "law-ful performance", I further find that it was not material enough to taint the presumption that "one or more" law enforcement officers were acting in performance of their duties.

There remains only the question of whether the doctrine of collateral estoppel makes my opinion in these matters immaterial. The Defendants have raised many other issues, but I feel they do not merit separate discussions.

The Defendants claim that the government is collaterally estopped from litigating the issue of whether the posse comitatus statute was violated because this issue has already been resolved against the government in two previous prosecutions of other Wounded Knee Defendants.

■ Under the doctrine of collateral estoppel as usually expressed, "material facts or questions which were directly in issue in a former action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered therein, and . . . such facts or questions become res judicata and may not again be litigated in a subsequent action between the same parties or their privies, regardless of the form that the issue may take in the subsequent action." 46 Am.Jur.2d *Judgments* § 415 (1969).

Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since the Supreme Court's decision more than 50 years ago in *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), and has been said to be embodied in the Fifth Amendment guarantee against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 443–47, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

The traditional rule is that operation of the doctrine must be "mutual"—i. e., "unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action may use the prior judgment as determinative of an issue in the second action." *Blonder-Tongue v. Univer-*

sity Foundation, 402 U.S. 313, 320–21, 91 S.Ct. 1434, 1439, 28 L.Ed.2d 788 (1971). However, following the lead of Bernhard v. Bank of America, 19 Cal.2d 807, 122 P.2d 892 (1942), many jurisdictions have abandoned the mutuality rule in civil litigation, especially where the prior judgment is invoked defensively in a second action against a plaintiff bringing suit on an issue he has already litigated and lost as plaintiff in a prior action. See Blonder-Tongue v. University Foundation, supra, 402 U.S. at 323–30, 91 S.Ct. 1434 and Gerrard v. Larsen, 517 F.2d 1127 (8th Cir. 1975).

"Where the doctrine of mutuality has been eroded or abandoned in collateral estoppel cases, the courts employ as a criterion for the application of estoppel whether the party against whom the plea is asserted had been given a fair opportunity to be heard on the issue."

Gerrard v. Larsen, supra, 517 F.2d at 1135.

One question to be determined in the instant case is whether collateral estoppel is available to a criminal defendant against the government when the defendant himself was not a party (or privy) in the prior prosecution whose judgment is claimed to be determinative of an issue in the subsequent prosecution.

The government argues that collateral estoppel is unavailable to such a criminal defendant because of the mutuality rule. And, indeed, the only federal case we have found that allows a criminal defendant who was not a party to the prior prosecution to claim the benefit of collateral estoppel is United States v. Bruno, 333 F.Supp. 570 (E.D.Pa.1971). Nevertheless, because of the steady erosion of the mutuality rule in the area of civil litigation, we must ask whether collateral estoppel should be applicable here despite the lack of mutuality.

■ The doctrine of collateral estoppel has been applied in criminal cases despite the fact that strict mutuality has never been possible with respect to the conclusiveness of a criminal judgment. The government is prohibited from invoking collateral estoppel against a criminal defendant because "[a]n accused is constitutionally enti-

tled to a trial de novo of the facts alleged and offered in support of each offense charged against him and to a jury's independent finding with respect thereto." United States v. De Angelo, 138 F.2d 466, 468 (3rd Cir. 1943). Consequently, the government's argument that collateral estoppel should not be available to the Defendants in this case because of the mutuality rule is undercut by the fact that strict adherence to the rule has never been possible in the criminal area. See United States v. Bruno, supra, 333 F.Supp. at 576.

■ And "[t]he federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." Ashe v. Swenson, supra, 397 U.S. at 444, 90 S.Ct. at 1194.

■ If this were a civil action, the United States Supreme Court decision in Blonder-Tongue, supra, and the recent Eighth Circuit decision in Gerrard v. Larsen, supra, suggest that we do not refuse to apply collateral estoppel on the basis that the Defendants were not parties in the prior prosecution. The same reasons which support the abandonment of the mutuality rule in civil actions support its abandonment in criminal actions—namely, the "public policy calling for an end to litigation, as well as fairness and substantial justice, allowing every litigant but one opportunity to try his case on the merits." See 46 Am.Jur.2d Judgments § 523 (1969).

It would seem indefensible to refuse to apply collateral estoppel on the basis of lack of mutuality merely because this is a criminal action and not a civil one. "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." Ashe v. Swenson, supra, 397 U.S. at 443, 90 S.Ct. at 1194 quoting United States v. Oppenheimer, supra, 242 U.S. at 87, 37 S.Ct. 68 (Holmes, J.).

■ So, the Defendants should not be refused the opportunity to assert the doc-

trine of collateral estoppel merely because they were not parties in the prior prosecutions. The relevant inquiry should more properly be whether the government has had a full and fair opportunity to be heard on the issue which the Defendants claim has already been determined adversely to it. Before we consider that question, we should examine exactly what issue the Defendants claim the government is estopped from relitigating and why they claim so.

The Defendants in this action seek to estop the government from relitigating the question of whether the posse comitatus statute was violated by the government by the use of the military at Wounded Knee to execute the laws of the United States. The Defendants claim that:

1. The government has had a full and fair opportunity to litigate the question against other Wounded Knee defendants in two previous prosecutions, *United States v. Jaramillo,* supra, and *United States v. Banks-Means,* supra;

2. The question has been finally resolved against the government in each instance;

3. The government should be estopped from relitigating it against these defendants.

If this Court determines that the government is so estopped as against some or all of the Defendants, the charges against the Defendants would have to be dismissed since that holding will determine that the Plaintiff has not carried its burden as to the third element of the offense.

There have been three separate rulings on this issue.

█ In *United States v. Banks-Means,* supra, Judge Nichol did not have before him the same evidence as was presented in this case. By presenting additional evidence, I find that these Defendants have waived any claim that the ruling in *United States v. Banks-Means,* supra, created a basis for collateral estoppel.

█ In *United States v. Red Feather,* supra, Judge Bogue had before him the same record on the issue as Judge Urbom and as do I, but that case has not gone to final judgment, therefore, it is not yet effective as a conclusive determination, and, in fact, it is a decision in these very cases.

That leaves as the only case from which the doctrine of collateral estoppel can arise, the case of *United States v. Jaramillo,* supra.

Looking to *United States v. Jaramillo,* supra, we find that Judge Urbom was confronted with a court-tried case involving violations of 18 U.S.C. § 231(a)(3) which allegedly occurred at Wounded Knee on March 9, 1973. Examination of part III of his opinion indicates that a material question was whether the Federal Bureau of Investigation agents and the United States marshals at Wounded Knee on March 9, 1973, were lawfully engaged in the lawful performance of official duties. Resolution of this question hinged directly on whether the posse comitatus statute had been violated by use of the military up to and including March 9, 1973.

█ Judge Urbom concluded "that there is a reasonable doubt as to whether the law enforcement officers were 'lawfully engaged in the lawful performance of their official duties.'" *Id.,* 380 F.Supp. at 1381. He reasoned that the evidence raised a doubt as to whether the posse comitatus statute had been violated by use of the military up to and including March 9, 1973. *Id.,* 380 F.Supp. at 379. Judge Urbom's decision, if applicable, is applicable to all of the cases before me because each of the alleged violations occurred after March 9, 1973. He decided that use of the military up to and including March 9, 1973, was such as to raise a reasonable doubt as to whether the posse comitatus statute had been violated. This decision necessarily includes a decision that use of the military up to and including any date after March 9th was such as to raise a reasonable doubt as to whether the posse comitatus statute had been violated. And the doctrine of collateral estoppel applies to "matters necessarily decided in the former judgment." *Nelson v. Swing-A-Way Manufacturing Company,*

266 F.2d 184, 187 (8th Cir. 1959); see 46 Am.Jur.2d *Judgments* § 423 (1969).

This determination was one of mixed fact and law. Though it was ultimately a factual determination, it was guided by legal assumptions about the meaning of the posse comitatus statute.[5]

We realize that it is not entirely clear whether the doctrine of collateral estoppel applies to questions of mixed fact and law. (Compare *Ashe v. Swenson,* supra, 397 U.S. at 443, 90 S.Ct. 1189—"an issue of ultimate fact"—with *Yates v. United States,* 354 U.S. 298, 336, 77 S.Ct. 1064, 1086, 1 L.Ed.2d 1356 (1957)—"determinations of fact, and mixed fact and law.")

But, as pointed out earlier, after the government has had a full opportunity to be heard on the issue, the public policy which calls for an end to litigation, as well as fairness and substantial justice, need allow to every litigant but one opportunity to try the case on the merits.

On that reasoning, whether the question is one of law, fact, or mixed law and fact would seem immaterial.

But, where a trial judge, as in *United States v. Jaramillo,* supra, establishes a rule or standard of law, application of the doctrine of collateral estoppel would extend that ruling, which is the law of the first case, to become the law of the second case.

The primary risk is not one of eroding the power of the second court. A more serious risk is that after the doctrine is applied in a matter of first instance, when it gets to the appellate court, that court is foreclosed from considering other, equally useful reasoning as to the question of law, which would normally generate in the second trial court.

 For this reason, I find that the doctrine of collateral estoppel should not extend to questions of law.

 I conclude, therefore, that the doctrine of collateral estoppel does not compel

me to accept the standards of law developed in *United States v. Jaramillo,* supra.

Therefore, I revert to my original analysis and find the following Defendants guilty as charged:

1. Christopher Oliver Land
2. Richard J. Garnier
3. Geneva Red Feather
4. Sioux Casper
5. Martina Ellen White Bear
6. Joseph Bill

As before stated, I find the following Defendants not guilty:

1. Richard Dean McArthur
2. Melvin Lee Houston
3. John Milford Thomas
4. Lawrence Anthony Tennecour

Let judgments of conviction and acquittal be entered accordingly.

The convicted Defendants will report within twenty (20) days of the date of this memorandum and order to the Chief Probation Officer of the State of North Dakota for preparation of a presentence report.

Meanwhile existing bonding arrangements are continued.

### ORDER

On October 17, 1975, this Court entered its memorandum and order in which the above named Defendant (among others) was found guilty as charged in the indictment. This proceeding is one of ten ostensibly transferred to this district from the District of South Dakota pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, at the request of the Defendants. Trial was to the Court without a jury, upon stipulated facts.

 It now appears that Defendant Garnier did not file a request and consent that this matter be transferred to this district for trial, as had been done in the related cases, notwithstanding that the Court was advised by counsel that such request and consent would be forthcoming.

---

**5.** For example, Judge Urbom made the legal assumption that "use of military personnel, not materiel, . . . is proscribed by 18 U.S.C. § 1385."

The fact remains that no such document is on file in this proceeding.

Now Therefore, it appearing to the satisfaction of this Court that the above named Defendant, Richard John Garnier, has not requested or consented that his case be transferred from the District of South Dakota to this district for trial, it is

ORDERED that the aforesaid memorandum and order dated October 16, 1975, and filed with the Clerk on October 17, 1975, *as it concerns the Defendant Richard John Garnier only,* be, and the same hereby is, *vacated,* and the above captioned matter is returned to the United States District Court for the District of South Dakota for further proceedings before that Court.