**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Allen Eugene HARTLEY and John Joseph Murphy, Defendants-Appellants.**

**No. 86–4061.**

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1986.

Douglas Gelo, El Paso, Tex., for defendants-appellants.

Joseph S. Cage, Jr., U.S. Atty., D.H. Perkins, Jr., Sonia D. Peters, Asst. U.S. Attys., Shreveport, La., for plaintiff-appellee.

Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Defendants Allen Eugene Hartley and John Joseph Murphy appeal from their convictions for illegally importing marijuana into the United States in violation of 21 U.S.C. §§ 952(a), 960. Defendants urge on appeal that all evidence seized by the Government following their arrest should have been excluded on the basis that the Government violated the Posse Comitatus Act, 18 U.S.C. § 1385. Finding no grounds which warrant exclusion of the evidence, we reject defendants' arguments and affirm the judgment of the district court.

## I. BACKGROUND

The Posse Comitatus Act provides:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

Defendants contend that the Government violated the Posse Comitatus Act by using United States Air Force equipment and personnel "to execute the laws." In order to place defendants' contention in the proper perspective, it is necessary to describe the events leading up to defendants' arrest.

On May 2, 1985, United States Customs Service ("USCS") Agent Eldon Kern was riding aboard an airplane operated by the 552nd Airborne Warning and Controls Systems Wing ("AWACS") of the United States Air Force ("USAF"). The AWACS plane was engaged in a military mission to train USAF personnel in the operation of the equipment aboard the airplane.[1] Agent Kern's presence on the airplane was pursuant to a program of cooperation between USCS and the Air Force. *See generally* 32 C.F.R. §§ 213.1–213.11 (1985). Under this program of cooperation, the Air Force allows USCS agents to accompany military missions on a space-available basis consistent with the mission's military purpose. While on the flight, Agent Kern was assigned one of the nine radar screens aboard the Air Force plane. Agent Kern also had access to one of the airplane's radios to communicate with USCS offices in New Orleans.

During the May 2, 1985, mission, Captain Michael Shallenberger, who served on the AWACS mission as liaison officer to Agent Kern and as weapons director, spotted an unidentified aircraft on his radar screen. Since the aircraft was unidentified and headed toward the land area of the United States, it was of defense interest. Captain Shallenberger also pointed out the aircraft to Agent Kern, who looked at the tracking of the aircraft and radioed Customs officers of its presence. Since the spotted aircraft was also of interest to the security function of the USAF, Air Force personnel also continued to monitor the flight of the unidentified aircraft. At no time did the Air Force stop its military mission in order to provide assistance to Agent Kern.

Agent Kern informed the USCS's office of the suspect aircraft, and intercept planes operated by Customs were dispatched. The Customs' intercept aircraft reported that the suspect aircraft was a light twin engine plane.

Agent Kern continued to monitor the suspect aircraft's activity as it landed on an unfinished highway near Alexandria, Louisiana. The suspect airplane took off shortly after it landed. Customs agents and other non-military officials on the ground immediately began a search where the airplane had landed. The agents found a large quantity of marijuana and later arrested defendant Hartley in the vicinity where the suspect airplane had landed.

After the suspect airplane took off from its Louisiana rendezvous, Agent Kern, still

---

**1.** Defendants' counsel repeatedly urges in both his brief and oral argument to this Court that the primary purpose of the mission was to interdict drug smuggling into the United States. This Court has carefully examined the record and finds defendants' contention unsupported; rather, the record fully supports the district court's conclusion that the USAF personnel were on a military mission.

aboard the AWACS plane, resumed monitoring the suspect airplane until it landed again near Jackson, Mississippi, where defendant John Joseph Murphy was arrested.[2]

The district court denied defendants' motion to suppress evidence based on the Government's alleged violation of the Posse Comitatus Act. Defendants signed and filed plea arrangements in which they pleaded guilty to one count of the indictment in exchange for the dismissal of the remaining counts. The plea arrangement reserved defendants the right to appeal the denial of the motion to suppress.

## II. · POSSE COMITATUS ACT

Defendants assert that the participation of Captain Shallenberger and other Air Force personnel violates the Posse Comitatus Act and thus warrants the exclusion of all evidence obtained as a result of the defendants' arrest. Defendants base this conclusion on their assertion that the military involvement was so pervasive as to represent "use[ ] ... of the ... Air Force ... to execute the laws...." 18 U.S.C. § 1385. After carefully examining the record, the jurisprudence interpreting the Posse Comitatus Act, and recently enacted statutes regarding use of military equipment and personnel, *see* 10 U.S.C. §§ 371–378, we hold that the acts of the Government in the instant case do not warrant creation or extension of an exclusionary rule.

█ The Posse Comitatus Act,[3] which was passed shortly after the end of the Reconstruction Era, was designed to limit "the direct active use of federal troops by civil law enforcement officers" to enforce the laws of this nation. *United States v. Red Feather*, 392 F.Supp. 916, 922 (D.S.D. 1975). *See also* H.R. Rep. No. 97–71, Part II, 97th Cong., 1st Sess. 3 (1981), *reprinted in* 1981 U.S. Code Cong. & Ad. News 1781, 1785. *See generally* Furman, *Restrictions Upon Use of the Army Imposed by the Posse Comitatus Act*, 7 Mil.L.Rev. 85 (1960); Note, *Don't Call Out the Marines: An Assessment of the Posse Comitatus Act*, 13 Tex.Tech L.Rev. 1467 (1982). Congress has also sought to clarify the role of the military through recent enactments. H.R. Rep. No. 97–71, *supra*, at 3. As codified, sections 371 and 372 of Title 10 allow the military to share information and equipment with civilian law enforcement officials in certain instances. Sections 374(a) and (b) allow the Secretary of Defense to assign military personnel to operate and maintain equipment loaned to civilian officials in order to "monitor[ ] and communicate[ ] the movement of air and sea traffic." 10 U.S.C. §§ 371, 372, 374(a), (b).[4] Moreover, in examining allegations that military involvement in civilian law enforcement violated the Posse Comitatus Act, courts have noted that "aerial photographic reconnaissance flights and other like activities" do not reflect direct military involvement violative of the Posse Comitatus Act. *Red Feather*, 392 F.Supp. at 925. *See also United States v. McArthur*, 419 F.Supp. 186, 194 (D.N.D.1975), *aff'd sub nom., United States v. Casper*, 541 F.2d 1275 (8th Cir.1976) (per curiam),

---

**2.** At some point during Agent Kern's tracking of the suspect airplane, Agent Kern and the USAF missions crew commander had a discussion during which the commander agreed to move the AWACS plane orbit northwards in order to continue monitoring the suspect aircraft. The record indicates that this change in orbit did not interfere with the USAF's military mission. The record also indicates that the crew commander refused a similar request by Agent Kern during another part of the mission.

**3.** The phrase "posse comitatus" is literally translated from Latin as the "power of the county" and is defined at common law to refer to all those over the age of 15 upon whom a sheriff

could call for assistance in preventing any type of civil disorder. H.R.Rep. No. 97–71, Part II, 97th Cong., 1st Sess. 4 (1981), reprinted in 1981 U.S. Code Cong. & Ad. News 1781, 1786 (citing 1 W. Blackstone, *Commentaries* 343–44).

**4.** Other portions of the enactment restrict the direct participation of military personnel in the interdiction of a vessel or aircraft or in a search, seizure or arrest unless such activity is otherwise authorized by law. 10 U.S.C. § 375. *See also* 10 U.S.C. § 376 (assistance provided by chapter not to affect the military preparedness of the United States).

*cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).

It should also be noted that, even where a violation of the Posse Comitatus Act is found or suspected, courts have generally found that creation or application of an exclusionary rule is not warranted. *United States v. Wolffs,* 594 F.2d 77 (5th Cir. 1979); *United States v. Roberts,* 779 F.2d 565 (9th Cir.1986) (violation of Navy regulations and 10 U.S.C. §§ 371–378; no application or creation of exclusionary rule warranted); *United States v. Walden,* 490 F.2d 372 (4th Cir.), *cert. denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974); *State v. Danko,* 219 Kan. 490, 548 P.2d 819 (1976); *State v. Sanders,* 303 N.C. 608, 281 S.E.2d 7 (1981), *cert. denied,* 454 U.S. 973, 102 S.Ct. 523, 70 L.Ed.2d 392 (1981).[5] In *Wolffs,* this Court "pretermit[ted] discussion of whether there was a violation of the [Posse Comitatus Act] or [Army] regulation" in a case involving use of agents of the Army in a narcotics investigation. This Court stated:

> We need not decide that complex and difficult issue because, assuming without deciding that there was a violation, application of an exclusionary rule is not warranted. If this Court should be confronted in the future with widespread and repeated violations of the Posse Comitatus Act an exclusionary rule can be fashioned at that time.

*Wolffs,* 594 F.2d at 85 (footnote omitted).

■ Turning to the circumstances surrounding the instant case, we find no basis to warrant the creation or application of an exclusionary rule. *See Wolffs.* No military personnel directly participated in the interdiction of defendants' aircraft or in their arrest. Rather, the Air Force personnel and equipment provided only information regarding the movement of an unidentified aircraft entering the United States. Communication of such information, incidental to a military training mission, was contemplated by Congress. *See* 10 U.S.C. §§ 371, 374(b).[6] Moreover, as noted above, courts generally have found that such aerial reconnaissance does not violate the Posse Comitatus Act. This case fails to present any widespread or direct participation of the military in the interdiction of a vessel or aircraft, or in any search, seizure, or arrest. *Cf.* 10 U.S.C. § 375; 32 C.F.R. § 213.10(a)(3) (1985) (restricting such activity by military personnel). Thus, this case wholly fails to present a situation which might require considering the creation or application of the exclusionary rule. *See Wolffs.*

Accordingly, we reject defendants' contention that violation of the Posse Comitatus Act warrants application of the exclusionary rule. The judgment of the district court is

**AFFIRMED.**

---

5. Defendants' reliance for creation of an exclusionary rule on *People v. Burden,* 94 Mich.App. 209, 288 N.W.2d 392 (1979), is particularly unwarranted since that decision was reversed by the Michigan Supreme Court, 411 Mich. 56, 303 N.W.2d 444 (1981). In *Taylor v. State,* 645 P.2d 522 (Ok.Cr.1982), the court applied an exclusionary rule to a violation of the Posse Comitatus Act. Even if this Court were to take the step of creating an exclusionary rule for the Posse Comitatus Act, the *Taylor* case is clearly distinguishable since it involved the use of military police in an undercover drug operation and search.

6. The House of Representatives report, which accompanied the enactment of 10 U.S.C. § 374(b), stated:

> The Committee anticipates, however, that an increased sensitivity to the needs of civilian law enforcement officials, particularly in drug enforcement, will permit more compatible mission planning and execution. For example, the scheduling of routine training missions can easily accomodate the need for improved intelligence information concerning drug trafficking in the Caribbean.

H.R.Rep. No. 97–71, Part II, *supra,* at 8, U.S. Code Cong. & Admin.News 1981, p. 1791.