UNITED STATES of America

v.

**Fawaz YUNIS.**

**Crim. A. No. 87-0377.**

United States District Court, District of Columbia.

Feb. 12, 1988.

J. Ramsey Johnson, Karen A. Morrissette, Jennifer Gold, Asst. U.S. Attys., Washington, D.C., for plaintiff.

Francis D. Carter, Turner and Carter, Washington, D.C., for defendant.

**PRETRIAL MEMORANDUM ORDER NO. 3**

(Denying Defendant's Motion to Dismiss for Violation of the Posse Comitatus Act)

BARRINGTON D. PARKER, District Judge.

The Posse Comitatus Act ("the Act"), 18 U.S.C. § 1385, prohibits the use of the nation's military forces as a posse comitatus [1] or otherwise to execute the laws of the United States. Counsel for Fawaz Yunis has moved to dismiss the indictment claiming that the involvement of the United States Navy in the apprehension and arrest of the defendant in the Mediterranean Sea and later, his transportation to the United States, violated the Act.

This Court concludes that the motion should be denied. The Navy's participation and involvement did not embrace nor did it extend to such regulatory, proscriptive, or compulsory military powers as contemplated under the Act. The facts in this case show that the Navy played at most, a passive role which indirectly aided the execution of United States laws. By providing military materials, supplies and equipment to the Federal Bureau of Investigation ("FBI"), the Navy did not violate the Posse Comitatus Act. Moreover, that service branch was merely aiding law enforcement efforts of FBI agents in international waters, where no civil governmental authority existed.

**I.**

The Act provides that:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not

---

1. The phrase "posse comitatus" is literally translated from Latin as the "power of the county" and is defined at common law to refer to all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type

of civil disorder. *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir.1986) (citing H.R.Rep. No. 97-71, Part II, 97th Cong., 1st Sess. 4 (1981)), 1981 U.S.Code Cong. & Admin.News 1781, 1786.

more than $10,000 or imprisoned not more than two years, or both.[2]

18 U.S.C. § 1385 (1979). It was originally enacted in response to the use of military personnel to enforce laws in the South during the reconstruction period following the Civil War. Legislative history indicates that the immediate objective of the Act was to end the use of federal troops in former confederate states where civil power had been reestablished. Many southerners believed the troops altered the outcome of state elections by actively supporting reconstruction candidates in disputed elections. *See, Chandler v. United States*, 171 F.2d 921, 936 (1st Cir.1948); 7 Cong. Rec. 4245 (1878) (remarks of Sen. Merriman); *id.* at 3847 (remarks of Sen. Hale). Nearly 40 years ago, our Circuit Court noted that Congress intended to preclude the military from assisting local law enforcement officers in carrying out their duties. *Gillars v. United States*, 182 F.2d 962, 972 (D.C. Cir.1950). As noted in a recent appellate ruling, the Act was designed to limit "the direct active use of federal troops by civil law enforcement officers" to enforce the laws of the nation. *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir.1986) (quoting *United States v. Red Feather*, 392 F.Supp. 916, 922 (D.S.D.1975)). Limiting military involvement in civilian affairs is basic to our system of government and the protection of individual constitutional rights.

### A.

Because the proscriptions of the Act have been relied upon in various situations, several tests have been articulated to determine whether an individual's rights have been infringed upon through violations of the statute. In the litigation which arose out of the standoff between Native American Indians and federal law enforcement authorities at Wounded Knee, South Dakota, in 1973, United States Marshals, FBI agents, the National Guard, as well as Army and Air Force personnel were both visible and involved. The first test was whether civilian law enforcement agents made "direct active use" of military personnel to execute the laws. *Red Feather*, 392 F.Supp. at 921. (The statute prohibits the "direct active use of Army or Air Force personnel and does not mean the use of Army or Air Force equipment or materiel." *Id.*). The second, whether "use of any part of the Army or Air Force pervaded the activities" of the civilian law enforcement agents. *United States v. Jaramillo*, 380 F.Supp. 1375 (D.Neb.1974), *appeal dismissed*, 510 F.2d 808 (8th Cir.1975) (No one questioned that substantial amounts of Army material and equipment were used. But "it is the use of military personnel, not materiel, which is proscribed by 18 U.S.C. § 1385." *Id.* at 1379. Since there was reasonable doubt whether military personnel were involved enough to render their actions unlawful, the defendants were acquitted. *Id.* at 1381). The third test is whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature. *United States v. McArthur*, 419 F.Supp. 186 (D.N.D.1975), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). (In *McArthur*, military personnel were used, but it was "not material enough to taint the presumption that the law enforcement officers were acting in performance of their duties." *Id.* at 195. "[T]he borrowing of highly skilled personnel, like pilots and highly technical equipment like aircraft and cameras, for a specific, limited, temporary purpose is far preferable to the maintenance of such personnel and equipment by the United States Marshals' Service." *Id.* at 194).

### B.

It is not surprising that arguments similar to those relied upon by Yunis' counsel have been regularly advanced by a number of defendants charged with federal crimes, who resided abroad when the military was

---

**2.** Counsel for the government and the defendant differ as to the application of the Act to the Navy's apprehension and arrest of Fawaz Yunis.

This matter is discussed in some detail, *infra* pp. 893–94.

utilized to effect their arrest. In the late 1940's the First Circuit held when United States military forces arrested a defendant overseas in an area where no civil regime exists, that there was no violation of the Act. *Chandler v. United States*, 171 F.2d 921 (1st Cir.1948), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949) ("[T]his is the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent," particularly in an enemy territory occupied by the United States military. *Id.* at 936). In another situation, when military authorities in an allegedly illegal and unlawful manner brought from Japan to San Francisco, a notorious American citizen—Tokyo Rose—suspected of treason, her counsel's claim that the Posse Comitatus Act had been violated, and that the federal court lacked jurisdiction, was of no avail. *Iva Ikuko Toguri D'Aquino v. United States*, 192 F.2d 338, 351 (9th Cir. 1951). Relying upon *Chandler* and *Gillars, supra* p. 892, the Ninth Circuit held that the defendant's claim was without merit. Both *Toguri D'Aquino* and *Chandler* involved situations where the United States military had a substantial presence in post-war enemy territory. More than two decades later, the Ninth Circuit in *United States v. Cotten*, 471 F.2d 744 (9th Cir.1973), again rejected the posse comitatus argument as applied to persons abducted overseas. Two Americans living in Viet Nam were forcibly returned to the United States and later charged with federal law violations. They claimed that the use of military personnel and equipment to remove them from Viet Nam and bring them to the United States violated the Act as well as their due process rights. The Ninth Circuit recognized that defendants had been treated severely (military handcuffs, leg irons and cargo chains were used and defendants were "physically subdued" with blows to the back of the head). The government acknowledged that the military's removal was in fact a kidnapping of the defendants. Nonetheless, the Circuit Court found no violations of the Act and denied challenges to federal court jurisdiction.

## II.

At the recent February 5, 1988 argument on this motion, government counsel took the position as it had done throughout their pleadings that the Act by its express terms does not apply to the Navy. Thus Navy participation did not provide a basis for the relief sought—dismissal of the indictment. Counsel for defendant however, has steadfastly maintained that the Act applies to the Navy even though only the Army and Air Force are the services mentioned in Title 18. A canvass and review of case law shows that there may be some merit to his position. In this connection Yunis' counsel relies upon 10 U.S.C. §§ 371–378. That statute was enacted in 1981, as a part of the Department of Defense Authorization for Appropriations for Fiscal Year 1982, Pub.L. No. 97–86, 95 Stat. 1099 (1981). Title IX, § 905 of the Act, "Military Cooperation with Civilian Law Enforcement Officials," is the pertinent section and is codified at 10 U.S.C. §§ 371–378. As a part of the 1982 Defense Appropriations Act, new provisions were enacted to "clarify and reaffirm the authority of the Secretary of Defense to provide indirect assistance to civilian law enforcement officials, consistent with the principles established in the Posse Comitatus Act." S.Rep. No. 58, 97th Cong., 1st Sess. 148 (1981). The Senate Armed Services Committee further explained the rationale behind the laws:

> [T]he Department of Defense historically has provided some forms of indirect assistance to civilian law enforcement officials within the framework of the Posse Comitatus Act.... The Department has also loaned military equipment for use by civilian law enforcement agencies. But due to the age of the Posse Comitatus Act and its rather vague legislative history on the subject of indirect aid, court decisions have failed to outline uniformly the precise limits of permissible indirect assistance. This diverse guidance has created some uncertainties as to the authority of the Department ... to provide such aid.

*Id.* Recognizing that the Department of Defense ("DoD") is primarily concerned with military preparedness, the committee stated that "where available, indirect assistance by the Department of Defense can help civilian law enforcement officials.... For example, the loan of equipment or access to base or research facilities, where it does not interfere with military preparedness, would avoid cost duplication in buying and maintaining such equipment and facilities." *Id.* The final version of the appropriations bill agreed upon by a joint conference committee contained the same provisions which "clarif[ied] the authority of the Secretary of Defense to make available certain military equipment and facilities." H.R.Conf.Rep. 311, 97th Cong., 1st Sess. 119, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1860.

### A.

Very few cases have involved the military cooperation provisions of the Defense Authorization Act for 1982. A recent 1986 District Court opinion with facts similar to those presented here, held that the newly enacted sections 371–378, actually authorize the use of military aircraft to transport defendants when such defendants are under the direct control of civilian law enforcement officials. In *United States v. Gerena,* 649 F.Supp. 1179 (D.Conn.1986),[3] the use of naval helicopters and a military air base to transport civilian defendants from Puerto Rico to New York was upheld under the authority of §§ 372 and 375. Defendants were in the custody of United States Marshals at all times. The trial court in ruling that the military's involvement did not constitute a violation of either

the Posse Comitatus Act or 10 U.S.C. §§ 371–378 noted:

> Among the legitimate governmental interests promoted by the use of military involvement in civilian affairs is the interest 'in improving the efficiency of civilian law enforcement by giving it the benefit of military technologies, equipment, information, and training personnel.'

649 F.Supp. at 1182.

Section 372 actually empowers the Secretary of Defense to make available "any equipment, base facility, or research facility of the Army, *Navy,* Air Force, or Marine Corps to any Federal, State, or local civilian law enforcement purposes." 10 U.S.C. § 372 (emphasis added). This includes the assignment of military personnel, provided such assignment is done in accordance with adequate regulation and in compliance with applicable law. 10 U.S.C. § 375.

Regulations promulgated under the Appropriations Act, 32 C.F.R. §§ 213.1–213.11 (1987), also permit local DoD components to authorize the use of available military equipment for civilian law enforcement purposes. Section 210 of the federal regulations lays out the restrictions on DoD personnel participation: "The primary restriction on military participation in civilian law enforcement activities is the Posse Comitatus Act...." In explanation of the connection between the DoD military cooperation statutes and the Posse Comitatus Act, the regulations provide:

> The following forms of *indirect assistance activities are not restricted by the Posse Comitatus Act* ...:

---

**3.** *Gerena* was decided in December 1986, nearly twelve months after *United States v. Roberts,* 779 F.2d 565 (9th Cir.1986), a Ninth Circuit opinion which held that the Posse Comitatus Act did not apply to the Navy. In *Roberts,* the Court recognized, however, that the Navy had adopted the Act as a matter of policy. *Id.* at 567. In its opinion the Court declined to "defy [the] plain language by extending it [the Act] to prohibit use of the Navy." *Id.* Instead, the Court chose to focus on the proscriptions of 10 U.S.C. §§ 371–378, finding those provisions to be more directly applicable to the Navy. In analyzing §§ 371–378, the Court stated that "the Posse

Comitatus Act and sections 371–378 of Title 10 embody similar proscriptions against military involvement in civilian law enforcement." *Id.* at 568.

The *Gerena* Court did not follow the Ninth Circuit's strict construction of the Act. It relied upon *United States v. Del Prado–Montero,* 740 F.2d 113 (1st Cir.), *cert. denied* 460 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984) (the Act is "a proscription that has been extended by executive act to the Navy." 740 F.2d at 116) and the regulations promulgated under 32 C.F.R. § 213 which specifically address the Act's applicability to the Navy.

(ii) Such other actions, approved in accordance with procedures established by the head of the DoD Component concerned, that do not subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature.

32 C.F.R. § 213.10(a)(7). Under this regulation a court in reviewing the legality of the military involvement at issue, must decide whether the assistance in question subjected defendant Yunis "to the exercise of military power that is regulatory, proscriptive, or compulsory in nature."

### III.

In this proceeding, the Navy's activities in the apprehension of Yunis were not the type prohibited by the Posse Comitatus Act, nor were they prohibited by the DoD military cooperation laws. The FBI was in charge of the operation at all times. At most, the Navy merely provided necessary support services. Navy personnel never participated in the arrest or interrogation of the defendant. Their equipment and staff already stationed in the Mediterranean were at the disposal of the FBI for only limited purposes, involving a passive role. Their limited role included: advising the FBI crew aboard the yacht (used in the capture of the defendant) on its location in international waters; providing a launch to transport the defendant from the FBI yacht to the Navy vessel—the U.S.S. Butte, supplying the defendant with shelter, clothes, food, and toiletries [4] while on board the Navy launch and providing required medical attention; arranging a rendezvous between the Butte and the aircraft carrier —the USS Saratoga; piloting the Navy plane with the defendant and his FBI custodians from the Saratoga to the United States.

It is clear from these facts that the Navy's activities did not constitute direct active involvement in the execution of the laws, nor did the use of military personnel pervade the activities of the civilian authorities. Rather, it was a civilian operation originating from within the FBI. By its very nature, the operation required the aid of military located in the area. Under the direction of the FBI, the Navy gave the necessary support in the form of equipment, supplies, and services. The furnishing of materials, work, and services, standing alone, is not a violation of the Posse Comitatus Act. *See, e.g., Hartley,* 796 F.2d at 114; *Bissonette v. Haig,* 776 F.2d 1384, 1390; *Caspar,* 541 F.2d at 1276, *aff'g McArthur,* 419 F.Supp. at 194–95; *United States v. Hartley,* 486 F.Supp. 1348, 1356– 57 (M.Fla.1980); *Red Feather,* 392 F.Supp. at 923; *Jaramillo,* 380 F.Supp. at 1379.

There is further support for the position that Congress did not intend that the Posse Comitatus Act should prohibit the use of military material, supplies or equipment in the aid of executing the laws. More than fifty years ago, Congress established procedures that enable any government department (especially military departments) to furnish materials, work, and services to any other bureau or agency within the government. The Economy Act of 1932, 31 U.S.C. § 686.

Finally, the Navy personnel involved in the transportation of the defendant played passive roles. The Naval doctor gave Yunis a physical examination and later treated him for seasickness and pain to his wrist. The defendant's food was prepared by Navy personnel.

None of the Navy's activities constituted the exercise of regulatory, proscriptive, or compulsory military power. A power regulatory in nature is one which controls or directs. In this case defendant Yunis was under the exclusive control and authority (as well as the physical custody) of the FBI agents accompanying him. The military did not exercise any authority or control over the defendants, nor did the military threaten such control or authority.

Nor can it be said that the military's involvement was proscriptive. A power

---

**4.** Special Agent Thomas Hansen, case agent for the investigation involving the defendant, testified that the FBI reimbursed the Navy for items used by the FBI personnel while on board the U.S.S. Butte. He also purchased "items of health and comfort items, clothing, toiletries," for Yunis at the ship's store. Trans., January 28, 1988, at 38.

proscriptive in nature is one that prohibits or condemns. Again, the defendant was never confined by Navy personnel but at all times was in the custody of the FBI agents who arrested him. Yunis was in no real way ever subject to the proscriptive powers of the military or military law.

Finally, it cannot be said that the Navy's involvement was compulsory. A power compulsory in nature is one that exerts some coercive force. The military personnel involved exerted no such force over the defendant. In reality, the Navy's involvement in the operation was indifferent, passive, and subservient to the FBI's task.

## CONCLUSION

For the above stated reasons, the Court concludes that the Navy's involvement in the apprehension, arrest and transportation of the defendant from international waters of the Mediterranean Sea, until he arrived at Andrews Air Force Base, Maryland, did not violate the Posse Comitatus Act or any other federal law.

Accordingly, it is this 12th day of February, 1988,

## ORDERED

That defendant's motion to dismiss the indictment for alleged violations of the Posse Comitatus Act is denied.