(Slip Opinion)

# Military Support for Customs and Border Protection Along the Southern Border Under the Posse Comitatus Act

The Department of Defense's proposed use of military personnel to provide limited assistance with respect to certain Customs and Border Protection inspection and observation functions along the southern border of the United States is permissible under the Posse Comitatus Act and applicable regulations.

January 19, 2021

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE

The Posse Comitatus Act, 18 U.S.C. § 1385, restricts the use of "any part of the Army or the Air Force" in civilian law enforcement, unless expressly authorized by law. Consistent with these restrictions, for many years, the Department of Defense ("DoD") has provided assistance to the efforts by the Department of Homeland Security ("DHS") to stem the illegal flow of persons and contraband across the southern land border between the United States and Mexico. This assistance is principally authorized by chapter 15 of title 10 of the United States Code, 10 U.S.C. §§ 271–284, which allows DoD to provide a number of different forms of support to civilian law enforcement. Congress endorsed DoD's ongoing efforts in 2015 by providing that "[t]he Secretary of Defense may provide assistance to United States Customs and Border Protection for purposes of increasing ongoing efforts to secure the southern land border of the United States." National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1059, 129 Stat. 986–87 (2015) ("FY 2016 NDAA").

In February 2020, DHS requested that DoD perform 26 specific duties in support of U.S. Customs and Border Protection ("CBP") operations at the southern border for fiscal year 2021. *See* Memorandum for Oliver Lewis, Captain, USN, Executive Secretary, Department of Defense, from Juliana Blackwell, Acting Executive Secretary, Department of Homeland Security, *Re: Request for Extension of Department of Defense (DoD) Assistance in Support of U.S. Customs and Border Protection's (CBP) Southwest Border (SWB) Security Mission Through Fiscal Year (FY) 2021* (Feb. 3, 2020). DoD approved support for 22 of these 26 duties, most of which involved the kind of support that DoD already had been providing

1

to DHS, such as motor-transport operations support and a crisis-response force for certain urgent needs. *See* Memorandum for the Executive Secretary, Department of Homeland Security, from David S. Soldow, Captain, USN, Executive Secretary, Department of Defense, *Re: Request for Extension of Department of Defense Assistance in Support of U.S. Customs and Border Protection's Southern Border Security Mission Through Fiscal Year 2021* (June 23, 2020).

DoD, however, held off on approving support for four duties pending further consideration as to whether they would be consistent with the Posse Comitatus Act and DoD regulations implementing chapter 15. Those four duties concern rail-support, seal-check, port-of-entry-observer, and checkpoint-observer functions. We understand that the rail-support duty would have military personnel assist CBP personnel responsible for inspecting unoccupied, unlocked vehicles being transported across the southern border in bulk on rail cars. The seal-check duty would involve visually verifying whether commercial cargo trucks and containers have intact and unbroken seal tags, which CBP requires for trucks and containers passing through ports of entry. The port-of-entry and checkpoint observers would monitor the output of CBP's electronic systems that automatically collect and process data, such as license-plate information, about individuals and vehicles passing through a port of entry or U.S. Border Patrol checkpoint, and display an alert message if the system identifies a concern.

We conclude that neither the Posse Comitatus Act nor DoD's regulations prohibit the requested assistance. The rail-support and seal-check duties would not violate the Posse Comitatus Act because they would not involve military personnel subjecting civilians to military regulation, directly or actively participating in civilian law enforcement activities, or pervading the activities of civilian law enforcement. The port-of-entry and checkpoint-observer duties would not violate the Posse Comitatus Act because they would involve operating equipment and would not involve direct participation in civilian law enforcement activities, as expressly authorized by 10 U.S.C. § 274(c). All four duties would be similar to the types of support that the courts and this Office's precedents have held to be consistent with the Posse Comitatus Act and DoD regulations, and that the military is authorized to provide under chapter 15.

## I.

The Posse Comitatus Act generally prohibits the use of the military to engage in civilian law enforcement activities. At English common law, the sheriff had the right to summon a body of available adults, the posse comitatus, to assist in executing the laws or restoring civil order. *See Extraterritorial Effect of the Posse Comitatus Act*, 13 Op. O.L.C. 321, 322 (1989). This practice continued in the United States, and in the Judiciary Act of 1789, Congress vested the first federal law enforcement officers, the U.S. Marshals, with the "power to command all necessary assistance in the execution of [their] duty." Act of Sept. 24, 1789, ch. 20, § 27, 1 Stat. 73, 87. That power remains with the U.S. Marshals Service, now codified at 28 U.S.C. § 566(c).

In enacting the Posse Comitatus Act in 1878, Congress sought to prevent civilian law enforcement officials from generally relying upon the U.S. Army to assist with the enforcement of the civilian laws. The statute arose out of the objections of southern States to the use of the U.S. Army in civilian law enforcement during the Reconstruction era. *See Military Use of Infrared Radars Technology to Assist Civilian Law Enforcement Agencies*, 15 Op. O.L.C. 36, 42 (1991) ("*Military Use of Infrared Radars*"); *see* Act of June 18, 1878, ch. 263, § 15, 20 Stat. 145, 152; 7 Cong. Rec. 3845–3852 (May 27, 1878); 7 Cong. Rec. 4239–4248 (June 7, 1878). But the statute's restrictions are not limited to that historical episode and instead reflect an American tradition of limiting direct military involvement in civilian law enforcement. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 15 (1972).

In its current form, the statute provides that, except where "expressly authorized by the Constitution or Act of Congress," public officials may not use "any part of the Army or the Air Force as a posse comitatus or otherwise to execute the law." 18 U.S.C. § 1385.[1] The prohibition thus precludes "military personnel [from] applying force to the civilian community in the normal course of civil government" and prevents "actual or

---

[1] Although the Posse Comitatus Act applies only to the Army and the Air Force, DoD regulations implementing similar restrictions apply to the Navy and the Marines. *See* DoD Instruction 3025.21, ¶ 4.b, Defense Support of Civilian Law Enforcement Agencies (Feb. 27, 2013). The Secretary of Defense, however, is authorized to make exceptions on a case-by-case basis. *See id.* encl. 3, ¶ 3.

threatened coercion by persons subject to military discipline on behalf of civil law enforcement officers." Letter for Deanne Siemer, General Counsel, Department of Defense, from Mary Lawton, Deputy Assistant Attorney General, Office of Legal Counsel at 5 (Mar. 24, 1978) ("Lawton Letter").

As relevant here, Congress has expressly authorized the military to support civilian law enforcement under chapter 15. Among other things, chapter 15 authorizes the military to provide to civilian law enforcement information acquired in the normal course of military training or operations; equipment, training, and advice; and military personnel to maintain and operate equipment. *See* 10 U.S.C. §§ 271–74. Chapter 15 also authorizes military personnel to perform additional tasks in support of counterdrug activities. *See* 10 U.S.C. § 284. But while granting DoD authority to assist civilian law enforcement, Congress retained the core prohibition of the Posse Comitatus Act by requiring that the Secretary of Defense issue regulations "as may be necessary to ensure that any activity . . . under this chapter does not include or permit the direct participation" of a member of the military "in a search, seizure, arrest, or other similar activity." *Id.* § 275. The Secretary has implemented section 275 in DoD Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies (Feb. 27, 2013).

The somewhat oblique prohibition under the Posse Comitatus Act against using the military as "a posse comitatus or otherwise to execute the law," 18 U.S.C. § 1385, has led courts and this Office to employ different tests against which to measure whether the activities in question comply with this prohibition. *See* Memorandum for Jo Ann Harris, Assistant Attorney General, Criminal Division, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Use of Military Personnel for Monitoring Electronic Surveillance* at 11 (Apr. 5, 1994) ("*Electronic Surveillance*") ("[T]he courts have employed three slightly varying formulations of the test for determining whether military involvement in civilian law enforcement has crossed the line separating proper activity from violations of the PCA"); *Riley v. Newton*, 94 F.3d 632, 636 (11th Cir. 1996) (describing "three different tests"); *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (recognizing that courts have employed "one of three tests"). We have recognized that an action "does not violate the Posse Comitatus Act unless it actually regu-

lates, forbids, or compels some conduct on the part of those claiming relief." *Electronic Surveillance* at 10 (quoting *Bissonette v. Haig*, 776 F.2d 1384, 1390 (8th Cir. 1985), *aff'd en banc*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988)); *see also* Lawton Letter at 15–16. Under this test, courts consider whether a military activity "is that which is regulatory, proscriptive, or compulsory in nature and causes the citizens to be presently or prospectively subject to regulations, proscriptions, or compulsions imposed by military authority." *United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D. 1974), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976) (per curiam).

Courts have also employed a slightly different formulation: whether the military is conducting law enforcement activities, rather than merely supporting them, which is determined by whether the activities involve "the direct active participation of federal military troops in law enforcement activities." *United States v. Red Feather*, 392 F. Supp. 916, 924 (D.S.D. 1975). As noted, this is the test that Congress directed the Secretary of Defense to impose as a restriction on DoD's support for civilian law enforcement under chapter 15. *See* 10 U.S.C. § 275.

Finally, in some cases, courts have employed a third test to ensure that the military is not indirectly taking the lead in law enforcement activities, even when it is not operating directly on civilians. These courts ask whether the military activity in question "pervade[d] the activities of civilian officials." *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990) (quoting *United States v. Bacon*, 851 F.2d 1312, 1313 (11th Cir. 1988) (per curiam)). In a recent case, the Ninth Circuit, sitting en banc, concluded that a Naval Criminal Investigative Service ("NCIS") investigation into child pornography on the Internet violated DoD regulations restricting law enforcement activity by the Navy, because the NCIS investigation "pervaded the actions of civilian law enforcement." *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc).[2]

---

[2] One issue in *Dreyer* was whether NCIS was targeting offenses by military personnel. *See* 804 F.3d at 1276. It is well established that the Posse Comitatus Act does not restrict the actions of military personnel "where the military has a legitimate interest for its own proceedings or matters involving the internal administration of the military or the performance of its proper functions." *Permissibility Under Posse Comitatus Act of Detail of Defense Civilian Employee to the National Infrastructure Protection Center*, 22 Op. O.L.C. 103, 105–06 (1998) (alteration and quotation marks omitted); *see id.* at 106

In our prior opinions, we have often applied the "direct active participation" test in considering whether the activities were consistent with the restriction applicable to support provided under chapter 15. *See, e.g.*, Memorandum for the Attorney General from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Department of Defense Assistance in an Federal Bureau of Investigation Domestic Terrorism Investigation* at 4 (Nov. 5, 2002) ("*Domestic Terrorism*"); *Military Use of Infrared Radars*, 15 Op. O.L.C. at 38–39; *Use of Department of Defense Drug-Detecting Dogs to Aid in Civilian Law Enforcement*, 13 Op. O.L.C. 185, 186 (1989) ("*DoD Drug-Detecting Dogs*"). But in opinions not involving chapter 15 support, we have generally followed the lead of the courts of appeals by asking whether the military support would be consistent with all three of the court-applied tests, without worrying about whether they are all equally correct, or mutually exclusive. *See Permissibility Under Posse Comitatus Act of Detail of Defense Civilian Employee to the National Infrastructure Protection Center*, 22 Op. O.L.C. 103, 104 (1998) ("*NIPC Detail*") (asking whether the military support violated any of these tests); *Electronic Surveillance* at 11 (same); *cf.* Lawton Letter at 13 (concluding that the assistance in question did not violate the Posse Comitatus Act because, under any of the formulations the courts have employed, the assistance was "indirect and non-authoritarian").

We understand from your request that DoD would assist DHS by using National Guard members operating under federal command and control, who would be considered as either part of the Army or Air Force while operating in that status. *See Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 92 (1989); *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019).[3] Because those members would be subject to the Posse Comitatus Act, we must first consider whether Congress has expressly authorized the mili-

---

(explaining that "[n]othing in the [Posse Comitatus Act] suggests that Congress intended to circumscribe military participation in legitimately military matters"). Separately, the Posse Comitatus Act does not apply outside United States territory. *See Extraterritorial Effect of the Posse Comitatus Act*, 13 Op. O.L.C. at 344.

[3] By contrast, National Guard troops operating in militia status—that is, under state command and control—are not subject to the Posse Comitatus Act. *See Mueller*, 943 F.3d at 837; *Clark v. United States*, 322 F.3d 1358, 1367–68 (Fed. Cir. 2003).

tary to perform the four duties at issue.[4] Where Congress has not, we then consider whether those tasks nevertheless would be consistent with the Posse Comitatus Act.

## II.

We begin with the rail-support and seal-check duties. Both tasks would involve military personnel providing support to CBP in inspecting articles coming across the border. Neither would involve the military engaging or interacting directly with any civilians or assuming primary responsibility for searching the vehicles, cargo trucks, or containers in question. Military personnel would be under the direct supervision of CBP personnel, would not be expected to have any contact with civilians, and would not be expected to take custody of any evidence that might be used in any subsequent legal proceeding, such as a criminal prosecution. Both military and CBP personnel would receive training to ensure that they clearly understand the scope of the approved activities of the military personnel.

We understand that military personnel performing the rail-support duty would assist CBP personnel in inspecting unoccupied, unlocked vehicles being transported across the southern border in bulk on rail cars. This inspection would occur in a secured and private rail yard, and vehicle owners would have signed waivers authorizing the inspection. Military personnel would open the doors, trunks, and hoods of unoccupied vehicles to prepare them for CBP personnel's subsequent inspection of the spaces within the vehicles. Military personnel would not participate in that inspection. Military personnel would not be expected to make any observations as they open the vehicle doors, trunks, and hoods, but if they did notice something suspicious, they would immediately notify CBP personnel. Military personnel would have no involvement in any subsequent action.

---

[4] We do not believe that, under the facts presented, DoD's assistance to DHS would be expressly authorized by the Constitution. We have previously described the constitutional exception to the PCA as applying to "any use of the military for constitutional purposes," including the deployment of "troops pursuant to a plenary constitutional authority." Memorandum for the Attorney General from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Determination of Enemy Belligerency and Military Detention* at 9 (June 8, 2002). DoD's assistance here to support DHS's mission would not involve the plenary constitutional authority of the President.

We understand that the seal-check duty would involve similar support to CBP personnel. Military personnel would visually verify whether commercial cargo trucks and containers have intact and unbroken seal tags, which are required for the trucks and containers as they pass through ports of entry. This activity would take place at locations secured and controlled by CBP. Seal tags are located in plain view on the outside of the trucks and containers. In some cases, the cargo truck driver may be in the cabin of the truck while military personnel check whether the truck's seal tag is intact, but the seal tag is located at the rear of the truck and military personnel are not expected to have any contact with the driver. If military personnel notice a discrepancy in a seal tag, then they would immediately notify CBP personnel and would not participate in any subsequent inspection performed by CBP personnel.

## A.

We first consider whether these tasks are expressly authorized under chapter 15 or under the FY 2016 NDAA. We think that the chapter 15 question is straightforward, because neither the rail-support or seal-check duties fit within the tasks authorized under chapter 15. Sections 271 to 274 authorize DoD to support civilian law enforcement agencies by providing information, military equipment and facilities, training and advising, or the maintenance and operation of equipment. *See* 10 U.S.C. § 271–74. None applies here. Section 284(b)(6) likewise authorizes DoD to assist through the "detection, monitoring, and communication" of air, sea, and surface traffic within designated parameters of the U.S. borders, but those provisions do not speak to the inspection of goods. Likewise, we do not believe that any of the other activities authorized by section 284(b) would readily apply to these tasks.

Whether section 1059 expressly authorizes the rail-support or seal-check duties for purposes of the Posse Comitatus Act, however, is a closer question. As relevant here, section 1059(a) states that "[t]he Secretary of Defense may provide assistance to United States Customs and Border Protection for purposes of increasing ongoing efforts to secure the southern land border of the United States." FY 2016 NDAA § 1059(a).[5] The section continues:

---

[5] Section 1059 was enacted as part of the FY 2016 NDAA, but the section has no expiration date and remains in effect. *See, e.g.*, *United States v. Hernandez-Garcia*, No. 19-

The assistance provided under subsection (a) may include the following:

> (1) Deployment of members and units of the regular and reserve components of the Armed Forces to the southern land border of the United States.

> (2) Deployment of manned aircraft, unmanned aerial surveillance systems, and ground-based surveillance systems to support continuous surveillance of the southern land border of the United States.

> (3) Intelligence analysis support.

*Id.* § 1059(c). The rail-support and seal-check duties do not fall into any of the categories of activities specifically mentioned in section 1059(c)(2) and (c)(3): They involve neither the "[d]eployment" of the aircraft and surveillance equipment nor "[i]ntelligence analysis support." The duties could perhaps be viewed as falling within section 1059(c)(1), which permits the general "[d]eployment" of military personnel "to the southern land border" without specifying what missions such personnel would perform.

In addition, the categories in subsection (c) are not exclusive. The statute makes clear that the assistance "may include the following." *See Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (quoting 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland on Statutory Construction* § 47:7, at 305 (7th ed. 2007)). So we must also consider whether the rail-support and seal-check duties fall within the statute's authorization for general "assistance" to CBP for "purposes of increasing ongoing efforts to secure the southern land border" under section 1059(a).

---

CR-4373-GPC, 2020 WL 1083427, at *2 (S.D. Cal. Mar. 6, 2020) ("[T]he provision lacks any language expressly limiting its operative terms to fiscal year 2016."); *United States v. Rios-Montano*, 438 F. Supp. 3d 1149, 1151–52 (S.D. Cal. 2020) (rejecting the argument that section 1059's "legal effect lapsed with fiscal year 2016" because the section "provides an unrestrained grant of authority" and "contains no sunset provision"); *see generally* Memorandum for Mary De Rosa, Legal Adviser, National Security Council, from David J. Barron, Acting Assistant Attorney General, *Re: Engagement with the International Criminal Court* at 3 (Jan. 15, 2010) (noting that the "presumption against permanency" does not "automatically apply" to authorization acts (quotation marks omitted)).

The question then is whether either of these sections constitute express authorization for purposes of the Posse Comitatus Act. Both section 1059(a) and section 1059(c)(1) no doubt generally authorize deploying military personnel to the southern border to provide "assistance" to CBP in support of "ongoing efforts to secure the southern land border." But it does not follow that this authorization necessarily "expressly" authorizes actions that would otherwise violate the Posse Comitatus Act. 18 U.S.C. § 1385. In 1878, as now, "expressly" means "[i]n an express manner," "in direct terms," or "plainly." Noah Webster, *A Dictionary of the English Language* 156 (1878 ed.); Henry Campbell Black, *Dictionary of Law Containing Definitions of the Terms and Phrases of American and English Jurisprudence, Ancient and Modern* 462 (1891) (defining "express" to mean "[m]ade known distinctly and explicitly, and not left to inference or implication"); *Webster's (Third) New International Dictionary of the English Language* 803 (1993) (defining "expressly" to mean "in direct or unmistakable terms.").

Thus, for a statute to authorize a military activity expressly for purposes of the Posse Comitatus Act, we think that it must be clear that Congress has approved that activity without regard to the restrictions on using the military "as a posse comitatus or otherwise to execute the laws." 18 U.S.C. § 1385; *see Dorsey v. United States*, 567 U.S. 260, 273–75 (2012) (holding that statutory requirement that the "repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide," 1 U.S.C. § 109, is satisfied where the "plain import" or "fair implication" of the repealing Act is that it should apply to pre-Act offenders). We do not think that a general authorization of "assistance" necessarily means that the restrictions of the Posse Comitatus Act fall away.

The generic authorization in section 1059(a) and (c)(1) to "[d]eploy" military personnel "to the southern land border of the United States" for "assistance" to CBP in "ongoing efforts" does not reflect that kind of clear approval. To the contrary, we think that section 1059 points not to new forms of support DoD may provide, but rather toward the types of assistance that DoD had already been providing to CBP as part of "ongoing efforts," which include the types of activities specifically mentioned in section 1059(c)(2) and (c)(3). A contrary reading would dramatically change DoD's assistance to these "ongoing efforts," authorizing DoD to

perform functions not traditionally done at the southern border, including through "direct participation" by the military "in a search, seizure, arrest, or other similar activity." 10 U.S.C. § 275; *see also* Memorandum for Jamie Gorelick, Deputy Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Use of Military to Enforce Immigration Laws* at 2 (May 10, 1994) ("*Immigration Laws*") (recognizing that the "direct use of the military to detain or arrest suspect aliens would violate" the Posse Comitatus Act "unless otherwise authorized by law"). We think it quite unlikely that Congress would have so significantly changed DoD's mission at the border by generally authorizing the "deployment" of military personnel to provide "assistance."

Where Congress has affirmatively authorized DoD to provide assistance to law enforcement in other contexts, it has often included restrictions on the military's "direct participation" in encounters with civilians. In fact, in another provision of the FY 2016 NDAA, Congress authorized the military to provide "assistance" to the Department of Justice in its efforts to investigate domestic bombings of places of public use or of Government facilities. FY 2016 NDAA § 1082(a), 129 Stat. at 1003–04 (codifying 10 U.S.C. § 383, now 10 U.S.C. § 283). In so doing, Congress took care to specify that military personnel were not authorized to engage in "arrest[s]"; any "direct participation in conducting a search for or seizure of evidence"; or any "direct participation in the collection of intelligence for law enforcement purposes," save in narrowly delineated circumstances. *Id.* (codifying 10 U.S.C. § 383(c)(2), now 10 U.S.C. § 283(c)(2)); *see also* 10 U.S.C. § 282(c)(2)(B) (providing similar limited authority for military personnel to engage in searches and seizures in investigating emergency situations involving weapons of mass destructions).

Congress provided no such limitation in authorizing "assistance" under section 1059. One could perhaps infer from the absence of such language that Congress intended to authorize DoD to provide assistance to CBP in a manner that did not restrict "direct participation" in arrests, searches, and seizures. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and brackets omitted)). But we think that the

more likely inference is that Congress sought to authorize the kinds of "ongoing" assistance that DoD had been providing under chapter 15, consistent with the existing statutory restriction on "direct participation" required by 10 U.S.C. § 275.[6] At a minimum, with two plausible interpretations available, we cannot say that Congress expressly authorized the support to proceed without regard to the restrictions of the Posse Comitatus Act.

Elsewhere, when Congress has authorized the military to engage in civilian law enforcement activities, it has explicitly stated that the Posse Comitatus Act is inapplicable to those activities, *see, e.g.*, 5 U.S.C. app. 3, § 8(g) ("The provisions of section 1385 of title 18, United States Code, shall not apply to audits and investigations conducted by, under the direction of, or at the request of the Inspector General of the Department of Defense to carry out the purposes of this Act."); 18 U.S.C. § 831(f)(1) (stating that DoD may provide specified assistance to the Attorney General "[n]otwithstanding section 1385 of this title" if certain conditions are met), or authorized the military to engage in activities that plainly involve coercive action against civilians, *see, e.g.*, 10 U.S.C. § 251 (authorizing the military, under certain circumstances, to "suppress . . . insurrection[s]"); *id.* § 252 (authorizing the military to "enforce the laws of the United States" and to "suppress . . . rebellion[s]"); *id.* § 253 (authorizing the military to take needed "measures . . . to suppress . . . any insurrection, domestic violence, unlawful combination, or conspiracy"); 18 U.S.C. § 112(f) (authorizing the Attorney General to seek the assistance of,

---

[6] This interpretation is consistent with the section 1059's legislative history, which reflects an intent to authorize "the *ongoing* efforts by [DoD] to provide additional assistance to secure the southern land border of the United States"—assistance that DoD provided consistent with the Posse Comitatus Act—and desire that DoD "*continue* these efforts and coordinate with the Secretary of Homeland Security to identify opportunities to provide additional support." Sen. Rep. No. 114-49, at 206 (2015) (emphases added); *see also* National Defense Authorization Act for Fiscal Year 2016: Legislative Text and Joint Explanatory Statement 740 (Comm. Print Nov. 2015) (noting that section 1059 "would authorize the Secretary of Defense . . . to provide assistance to [CBP] for the purpose of increasing the *ongoing* efforts to secure the southern land border of the United States" (emphasis added)). We have not located any legislative history suggesting that Congress intended that military personnel deployed to the border to provide "assistance" to CBP under section 1059 could depart from the sort of assistance the military had previously provided to civilian law enforcement consistent with the Posse Comitatus Act and DoD's regulations.

among other agencies "the Army, Navy, and Air Force" in enforcing the criminal prohibition on harming foreign dignitaries); *id.* § 1751(i) (authorizing the Attorney General to seek the assistance of, among other agencies "the Army, Navy, and Air Force" in investigating the criminal prohibition on murdering or assaulting the President or presidential staff). *See generally Extraterritorial Effect of the Posse Comitatus Act*, 13 Op. O.L.C. at 340 (discussing 21 U.S.C. § 873(b), which authorizes the Attorney General to request military assistance to enforce the Controlled Substances Act).

We think that these specific authorizations in the U.S. Code for the military to provide particular support reinforce that the more general authorization of assistance in section 1059 should not be read to authorize actions without regard to the limitations of the Posse Comitatus Act. As the Court has recognized, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In addition, specific statutory provisions inform the meaning of more general ones, and this canon "has full application . . . to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The contrast between the generality of section 1059 and the specificity of these other provisions suggest that Congress did not intend section 1059(a) and (c)(1) to authorize the "deployment" of military personnel to provide "assistance" to CBP without regard to whether such assistance would otherwise violate the Posse Comitatus Act.

This interpretation is consistent with the Office's prior caution in reading generally worded statutes to authorize the military to engage in coercive civilian law enforcement activities. In 1994, this Office concluded that the Attorney General's authority to delegate immigration law enforcement functions to "any employee of the United States" did not clearly authorize the Attorney General to delegate such authority to military personnel to engage in immigration-enforcement activities that would otherwise violate the Posse Comitatus Act.[7] *See Immigration Laws* at 9–

---

[7] The authority was then vested in the Attorney General. *See* 8 U.S.C. § 1103(a) (1994). The Homeland Security Act of 2002 transferred most immigration-enforcement functions to the Secretary of Homeland Security. *See* Homeland Security Act of 2002,

12. We explained that where a determination that a statute constitutes express authority for purposes of the Posse Comitatus Act "would represent a sharp departure from the traditional restrictions embodied" in the statute, the determination "should rest on a well-founded conviction that Congress intended such a result" because "it cannot be assumed that Congress would approve such a major change in the military's permissible law enforcement role without providing some specific indication that it was doing so." *Id.* at 12. The same year, we concluded that general language in the Electronic Communications Privacy Act of 1986 authorizing "government personnel" to assist in electronic surveillance, *see* 18 U.S.C. § 2518(5), was insufficiently clear to authorize expressly military personnel to engage in surveillance that would otherwise violate the Posse Comitatus Act. *See Electronic Surveillance* at 4–6. These precedents suggest that the similarly general authorization in section 1059 does not authorize coercive military participation in civilian law enforcement activities with the requisite clarity.

This conclusion also accords with judicial opinions addressing whether an activity is expressly authorized for purposes of the Posse Comitatus Act. Courts have found such express authority when the statute specifically refers to the Posse Comitatus Act. *See, e.g.*, *United States v. Stouder*, 724 F. Supp. 951, 954 (M.D. Ga. 1989) ("Congress specified in § 8(g) of the Inspector General Act of 1978 that . . . '[t]he provisions of section 1385 of title 18, United States Code . . . shall not apply to audits and investigations conducted by . . . the Inspector General of the Department of Defense.'"). They have reached the same conclusion when the statute authorizes the military to engage in a particular activity with such specificity that Congress clearly approved the particular use of the military.[8]

---

Pub. L. No. 107-296, § 1102(2)(A), 116 Stat. 2135, 2273 (2002), as amended by Consolidated Appropriations Resolution, Pub. L. No. 108-7, div. L, § 105(a)(1), 107 Stat. 11, 531 (2003).

[8] *See, e.g.*, *Gilbert v. United States*, 165 F.3d 470, 473–74 (6th Cir. 1999) (noting that 32 U.S.C. § 112(b) authorizes the National Guard, while not in federal service, to be used for the "purpose of carrying out drug interdiction and counter-drug activities"); *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995) ("This DEA airlift was specifically authorized by § 1004 of the National Defense Authorization Act for Fiscal Year 1991 ('NDAA'), which allows military 'transportation of supplies and equipment for the purpose of facilitating counter-drug activities.'"); *United States v. Allred*, 867 F.2d 856,

At the same time, we have identified several decisions that have read somewhat general statutes as constituting express authorization under the Posse Comitatus Act. Of note, two district court judges have suggested, albeit with little analysis, that section 1059 does constitute express authorization under the Posse Comitatus Act. *See United States v. Hernandez-Garcia*, No. 19-CR-4373-GPC, 2020 WL 1083427, at \*3 (S.D. Cal. Mar. 6, 2020) (Curiel, J.) ("[T[he Court finds that the 2016 NDAA unambiguously authorized the participation of DoD personnel at issue here, namely, their observation of someone alleged to be Mr. Hernandez-Garcia through a scope, and their subsequent communication with BPA Allen-Limon as to that person's location."); *United States v. Cardenas-Tovar*, No. 19-CR-04370-BTM, 2020 WL 905634, at \*3 (Feb. 25, 2020) (Moskowitz, J.) ("Even assuming *arguendo* that the Marines' involvement rose to the level of direct involvement, however, such involvement appears to have been 'otherwise authorized by law' pursuant to Section 1059 of the National Defense Authorization Act for Fiscal Year 2016."); *United States v. Rios-Montano*, 438 F. Supp. 3d 1149, 1151, 1054–55 (S.D. Cal. 2020) (Curiel, J.) (agreeing that section 1059 "'authorize[s] by law' the Marine Corps' conduct on the United States' southern border with Mexico" (alteration in original)). We believe that these decisions are correct insofar as these cases involved military surveillance activities that were specifically and expressly authorized by section 1059(c)(2). But we would not read these decisions as suggesting that section 1059(a) and (c)(1) expressly authorize the deployment of military personnel to provide assistance to CBP without regard whether to such assistance would otherwise conflict with the Posse Comitatus Act.

Two other courts have similarly read general statutes to constitute express authorization of certain activities for purposes of the Posse Comitatus Act. *See United States v. Allred*, 867 F.2d 856, 871 (5th Cir. 1989) (suggesting, in dictum, that the Attorney General's authority to appoint Special Assistant United States Attorneys constitutes an express authorization for purposes of the Posse Comitatus Act); *Red Feather*, 392 F. Supp. at 923 ("The Economy Act, 31 U.S.C. § 686, expressly authorizes any executive department or independent establishment of the government, or any bureau or office thereof, to place orders with any other such

---

871 (5th Cir. 1989) (relying on 10 U.S.C. § 806(d)(1) in holding that military lawyers are statutorily authorized to represent the United States in criminal cases).

department, establishment, bureau, or office, for materials, supplies, or equipment." (quotation marks omitted)). We think that the better reading of the decisions in these cases, if not their reasoning, is that the pertinent activities, such as furnishing materials or supplies or the use of a commissioned officer of the Judge Advocate General's Corps ("JAGC") as a special assistant to a United States Attorney, would generally not have violated the Posse Comitatus Act even without express authorization. *See Bissonette*, 776 F.2d at 1390 ("[T]he mere furnishing of materials and supplies cannot violate the [Posse Comitatus Act]."); *Assignment of Army Lawyers to the Department of Justice*, 10 Op. O.L.C. 115, 116 (1986) ("The Department may use JAGC lawyers to assist in preparing cases and in performing a number of other duties in connection with civil and criminal litigation under our responsibility, without raising issues under the Posse Comitatus Act.").[9] Neither *Allred* nor *Red Feather* considered section 1059 or, of course, whether it constitutes express authorization under the Posse Comitatus Act.

Finally, our conclusion that section 1059(a) and (c)(1) does not expressly authorize the military to engage in activities without regard to the restrictions of the Posse Comitatus Act is consistent with DoD's practices since 2016. For many years now, DoD has deployed military personnel to the southern border to assist DHS, but has not used such personnel to conduct coercive immigration-enforcement activities. This Office, too, has regularly provided advice to DoD concerning the legal restrictions on the use of military in its ongoing support for DHS at the southern border, including with respect to the national emergency declared by the President on February 15, 2019, *see* Declaring a National Emergency Concerning the Southern Border of the United States, Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019). We have advised, for example, regarding whether certain military support provided to DHS is authorized by chapter 15, whether military personnel could engage in coercive civilian law enforcement activities in protecting ports of entry and other federal prop-

---

[9] The JAGC opinion also stated that "questions under the Posse Comitatus Act may be raised if military lawyers perform prosecutorial functions involving direct contact with civilians, unless such military lawyers are detailed to the Department on a full-time basis and operate under the supervision of departmental personnel." *Assignment of Army Lawyers to the Department of Justice*, 10 Op. O.L.C. at 116. The extent to which these "questions" might have been implicated by the facts in *Allred* is unclear, and in any event we need not address them here.

erty near the southern border, and whether the Insurrection Act could be invoked to stem the flow of illegal aliens across the southern border. At no point during these discussions has DoD or this Office treated section 1059(a) and (c)(1) as providing express authorization that would effectively moot any further consideration concerning the restrictions imposed by the Posse Comitatus Act.

## B.

Because DoD's activities at the border remain subject to the Posse Comitatus Act, we must consider whether the rail-support and seal-check duties are consistent with the statute's restrictions. In accordance with the approach taken in our prior opinions, we review these activities based upon each of the three tests that courts have used in evaluating military activities for compliance with the Posse Comitatus Act. We conclude that DoD's limited support for CBP inspections does not involve military personnel in the kind of coercive regulatory activity, direct participation in civilian law enforcement, or pervasive conduct that is prohibited by the Posse Comitatus Act absent express authorization.

## 1.

To start, we do not think that the rail-support and seal-check duties would subject any civilians to military regulation, proscription, or compulsion. *NIPC Detail*, 22 Op. O.L.C. at 105. Courts have explained that "[a] power regulatory in nature is one which controls or directs," "[a] power proscriptive in nature is one that prohibits or condemns," and "[a] power compulsory in nature is one that exerts some coercive force." *United States v. Yunis*, 681 F. Supp. 891, 895–96 (D.D.C. 1988), *aff'd* 924 F.2d 1086 (D.C. Cir. 1991); *United States v. Gerena*, 649 F. Supp. 1179, 1182–83 (D. Conn. 1986) (same).

The Eighth Circuit considered when military activities subject civilians to military regulation, proscription, or compulsion in *Bissonette v. Haig*. That case was one of several to arise from the U.S. military's involvement in a 1973 occupation by protesters of the town of Wounded Knee, South Dakota. The plaintiffs alleged that military personnel "maintained or caused to be maintained roadblocks and armed patrols constituting an armed perimeter around the village of Wounded Knee," which "seized,

confined, and made prisoners [of plaintiffs] against their will," and they also alleged that "they were searched and subjected to surveillance against their will by aerial photographic and visual search and surveillance." 776 F.2d at 1390–91. As to the allegations that troops had engaged in aerial surveillance, the court held that "that this sort of activity does not violate the Posse Comitatus Act." *Id.* at 1391. But the court held that the military's alleged activities in seizing individuals while setting up a roadblock sufficiently stated a claim that the troops had "in violation of the Posse Comitatus Act" engaged in activities that "were 'regulatory, proscriptive, or compulsory'" because they involved a claim that military personnel "directly restrained plaintiffs' freedom of movement." *Id.*

Here, military personnel performing the rail-support and seal-check duties are not expected to have any contact with civilians—much less to control, direct, coerce, or otherwise regulate them. *See United States v. Bacon*, 851 F.2d 1312, 1313–14 (11th Cir. 1988) (per curiam) (Army agent's undercover role in state drug investigation did not subject citizenry to regulatory exercise of military power, and therefore did not violate the Posse Comitatus Act); *United States v. Moraga*, No. 01-964, 2002 WL 35649965, at *10 (D.N.M. 2002) (use of air force dog and handler did not "compel the Defendant to do anything or forbid the Defendant from doing anything"); *Electronic Surveillance* at 11 ("Mere assistance by military personnel in the monitoring of court-authorized electronic surveillance by civilian authorities . . . is neither regulatory nor proscriptive, nor is it a compulsory application of military power"). Military personnel would provide support to CBP personnel by engaging in plain-view inspections of property and the fairly ministerial tasks of opening unoccupied vehicles. There is no sense in which such actions would subject civilians to military regulation, proscription, or compulsion.

## 2.

We next consider the "direct active participation" test, which asks whether military personnel have "direct active" involvement in law enforcement activities, or instead are playing a "passive role in civilian law enforcement activities." *Red Feather*, 392 F. Supp. at 924; *see NIPC Detail*, 22 Op. O.L.C. at 105; *Domestic Terrorism* at 4; *Electronic Surveillance* at 8. This test "permits a broad degree of cooperation between the military and civilian law enforcement." *NIPC Detail*, 22 Op. O.L.C. at

105. "Activities which constitute an active role in direct law enforcement are: arrest; seizure of evidence; search of a person; search of a building; investigation of crime; interviewing witnesses; pursuit of an escaped civilian prisoner; search of an area for a suspect and other like activities." *Red Feather*, 392 F. Supp. at 925; *see also Immigration Laws* at 2. By contrast,

> [a]ctivities which constitute a passive role which might indirectly aid law enforcement are: mere presence of military personnel under orders to report on the necessity for military intervention; preparation of contingency plans to be used if military intervention is ordered; advice or recommendations given to civilian law enforcement officers by military personnel on tactics or logistics; presence of military personnel to deliver military materiel, equipment or supplies, to train local law enforcement officials on the proper use and care of such material or equipment, and to maintain such materiel or equipment; aerial photographic reconnaissance flights and other like activities.

*Red Feather*, 392 F. Supp. at 925 (emphasis omitted); *see also Yunis*, 924 F.2d at 1094.

We believe that the military's provision of personnel to perform the rail-support and seal-check duties is permissible indirect, passive assistance under this framework. These duties would not require military personnel to perform any traditional law enforcement task, such as the arrest, seizure, or search of a person. There is a sense in which these duties may involve military personnel "searching" commercial cargo trucks and containers and vehicle compartments, at least to a small degree.[10] But our precedents make clear that not every activity that could be described as a "search," even if it is a "search" for purposes of the Fourth Amendment, constitutes direct participation in civilian law enforcement.

---

[10] The opening of a closed vehicle would likely constitute a search under the Fourth Amendment. *See United States v. Jones*, 565 U.S. 400, 406 n.3 (2012) ("Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred."). A plain-view search, however, of the seals on a cargo container would not. *See id.* at 412 ("This Court has to date not deviated from the understanding that mere visual observation does not constitute a search."); *New York v. Class*, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'").

In *Military Use of Infrared Radars*, for instance, we advised that military personnel do not directly participate in civilian law enforcement merely by providing aerial reconnaissance using Forward Looking Infrared Radars ("FLIR") technology to assist in identifying structures suspected of illegal drug production. *See* 15 Op. O.L.C. at 36–38. We assumed without deciding that FLIR surveillance might be a "search" for purposes of the Fourth Amendment but did not find that fact dispositive.[11] Instead, we concluded that "searches" constitute direct participation "at most" when they involve "physical contact with civilians or their property," and even then "perhaps only" when the searches involve "physical contact that [is] likely to result in a direct confrontation between military personnel and civilians." *Id.* at 39–40; *see also Domestic Terrorism* at 4 (same); *Military Use of Infrared Radars*, 15 Op. O.L.C. at 44 (reading the direct-participation restriction "to prohibit only activity that entailed direct, physical confrontation between military personnel and civilians"). And the courts too agree that surveillance operations, such as aerial reconnaissance, in support of civilian law enforcement constitute permissible indirect assistance. *See United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986) ("[I]n examining allegations that military involvement in civilian law enforcement violated the Posse Comitatus Act, courts have noted that 'aerial photographic reconnaissance flights and other like activities' do not reflect direct military involvement violative of the Posse Comitatus Act." (quoting *Red Feather*, 392 F. Supp. at 925, and collecting cases)); *Bissonette*, 776 F.2d at 1391 ("[P]laintiffs charge that they were searched and subjected to surveillance against their will by aerial photographic and visual search and surveillance. As we have already noted . . . this sort of activity does not violate the Posse Comitatus Act.").[12]

---

[11] *See Military Use of Infrared Radars*, 15 Op. O.L.C. at 48; *see generally Kyllo v. United States*, 533 U.S. 27, 34 (2001) ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where (as here) the technology in question is not in general public use." (citation and quotation marks omitted)).

[12] In *United States v. Johnson*, 410 F.3d 137, 147 (4th Cir. 2005), the Fourth Circuit stated that "[a] blood test constitutes a search under the Fourth Amendment . . . and thus falls under the rubric of law enforcement activities" requiring express congressional authorization. Unlike the rail-support and seal-check duties, the conduct of a blood test is an investigative activity and puts military officers within the chain of custody of evi-

We reached similar conclusions in opinions approving DoD support for civilian law enforcement by supplying drug-detecting dogs with military handlers. We agreed that DoD may provide this support "to identify packages containing illegal narcotics" because "the proposed use of the dogs and their handlers will not involve confrontation with civilians." *Use of Navy Drug-Detecting Dogs by Civilian Postal Inspectors*, 13 Op. O.L.C. 312, 316 (1989); *see also DoD Drug-Detecting Dogs*, 13 Op. O.L.C. at 186 ("[W]e believe that drug-detecting dogs may be used in searches of packages and places in the absence of persons with whom a confrontation may arise, as long as the actual seizure is made by civilian law enforcement personnel."). This was true notwithstanding the likelihood of physical contact with civilian property. *See generally United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) ("Ajax jumped and placed his front paws on the body of the car in several places during a walk-around sniff that took less than one minute.").

Courts have also held that military activities constituted permissible indirect support even where those activities involved some degree of physical contact with civilian property. In *United States v. Khan*, 35 F.3d 426 (9th Cir. 1994), the court held that Navy "logistical support and backup security" for a Coast Guard operation to interdict a suspected drug-smuggling ship constituted permissible indirect assistance notwithstanding the fact that Navy personnel actually boarded the ship. *Id.* at 431–32. The court explained that "Navy personnel on board the [ship] had acted under the command of the Coast Guard, and that only the Coast Guard had searched the ship and arrested the crew." *Id.* at 432. Similarly, the court in *United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998), concluded that similar Navy assistance was permissible indirect assistance to civilian law enforcement, even though, in addition to boarding the ship, "Navy engineers in the present case moved the fluids among the fifteen tanks" in order to facilitate a search of the tanks. *Id.* at 1259.[13]

---

dence. We do not read *Johnson* as holding that *every* military activity that might constitute a "search" for purposes of the Fourth Amendment necessarily constitutes the direct active use of military personnel in civilian law enforcement for purposes of the Posse Comitatus Act.

[13] In *Johnson*, military personnel performed a blood test that "would yield the primary evidence of guilt of a DUI offense and, should the driver not plead guilty and go to trial, the serviceman who performed the test likely would be called to testify." 410 F.3d at 148. By contrast, military personnel performing the rail-support and seal-check duties would

We think that both the rail-support and seal-check duties are plainly permissible under these precedents. The seal-check duty neither "involv[es] physical contact with civilians or their property" nor is "likely to result in a direct confrontation between military personnel and civilians." *Military Use of Infrared Radars*, 15 Op. O.L.C. at 39–40. Military personnel would merely observe the exteriors of cargo trucks and containers, and would have no physical contact with that property. With respect to the rail-support duty, military personnel would prepare the vehicles for inspection by CBP by opening vehicle doors, trunks, and hoods, but such cursory and incidental physical contact does not amount to direct participation. The military personnel's assistance to CBP is not likely to result in any interactions with civilians, since the vehicles would be unmanned and in a restricted rail yard. And if military personnel notice anything suspicious, they would immediately notify CBP personnel and not participate in any resulting law enforcement activities.

Because the rail-support and seal-check duties would not require military personnel to directly participate in traditional law enforcement activities, such as a search, seizure, or arrest, as those terms are understood in common parlance, and would not risk a confrontation with civilians, we do not believe that either duty would involve the direct active participation of military personnel in civilian law enforcement.

**3.**

Finally, the rail-support and seal-check duties in no way involve the activities of military personnel "pervad[ing] the activities of civilian law enforcement." *NIPC Detail*, 22 Op. O.L.C. at 105. The purpose of these duties is to allow military personnel to provide support for ongoing civilian law enforcement activities in which CBP personnel take the lead role. There is no sense in which DoD's support would pervade CBP's activities.

The federal courts have recognized that DoD's actions will not be pervasive where they merely provide support to civilian law enforcement. In *Yunis*, 681 F. Supp. at 895, the district court held that the Navy's in-

---

perform no investigative activities and would not be within the chain of custody of evidence.

volvement in the apprehension, arrest, and transportation of the defendant did not "pervade the activities of civilian authorities" because "it was a civilian operation originating from within the FBI." Further, "[u]nder the direction of the FBI," Navy personnel never participated in the arrest or interrogation of the defendant, and the Navy merely "gave the necessary support in the form of equipment, supplies, and services." *Id.* at 895; *see also Yunis*, 924 F.2d at 1094 (same). More recently, in *United States v. Holloway*, 531 F. App'x 582 (6th Cir. 2013) (per curiam), the court held that the actions of a Naval officer in discovering and notifying civilian law enforcement of the defendant's possession of child sexual abuse material did not "permeate" civilian law enforcement because, "after the Navy agent turned over the information she had on Holloway to the civil authorities, the military was not involved in the subsequent search of his home, the seizure of evidence, or his arrest." *Id.* at 583; *see also Hayes*, 921 F.2d at 103 (actions of military personnel did not pervade civilian law enforcement because, despite sharing information with the police and offering other aid, they "did not become involved in any of the activities typically performed by the police, namely the arrest, the search of the premises where the transaction occurred, the seizure of the evidence, or the transportation of that evidence to the station for testing").[14]

As in these cases, the role of military personnel performing the rail-support and seal-check duties would be strictly limited and peripheral to the CBP activities that the duties would support—investigative activities that would be undertaken by CBP personnel and not military personnel. Military personnel also would operate under the direct supervision of CBP personnel. The activities of military personnel would not come close to pervading CBP's law enforcement activities.

---

[14] In *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015), the court held that the military "investigation in this case pervaded the actions of civilian law enforcement" where the personnel "initiated an operation to search for individuals sharing child pornography online," and themselves testified that they conducted an "active" investigation. *Id.* at 1275. Unlike in *Dreyer*, military personnel performing the rail-support and seal-check duties would not be leading an investigation, but merely assisting CBP in its activities.

### III.

We turn next to the port-of-entry and checkpoint-observer duties. We believe that these duties fall within the types of activities expressly authorized under chapter 15, *see* 10 U.S.C. § 274, and, therefore, DoD is expressly authorized to perform those duties without the need for further evaluation under the Posse Comitatus Act.

We understand that military personnel performing these duties would monitor the output of CBP electronic systems that automatically collect and process data, such as license-plate information, regarding individuals and vehicles passing through a port of entry or U.S. Border Patrol checkpoint and display an alert message if the system identifies a concern. Military personnel would perform this duty in an enclosed location, either in close proximity to the port of entry or checkpoint or from a remote location. If military personnel see an alert message from the CBP electronic display, then they would notify CBP personnel who would take action in response. Military personnel would have no involvement in any resulting inspection or investigation.[15]

Section 274 is one of several provisions of chapter 15 that authorize the military to provide certain assistance to civilian law enforcement. Congress originally enacted section 274 in 1981, when it added a new subchapter to title 10, specifically concerning DoD support for civilian law enforcement, in order to provide a legislative clarification of congressional intent with respect to the Posse Comitatus Act so as to "maximize[] the degree of cooperation between the military and civilian law enforcement." *Military Use of Infrared Radars*, 15 Op. O.L.C. at 45 (quoting H.R. Rep. No. 97-71, pt. 2, at 3 (1981)); Department of Defense Authorization Act, 1982, Pub. L. No. 97-86, § 905(a)(1), 95 Stat. 1099, 1115 (1981). Any

---

[15] Military personnel additionally would be expected to visually observe and maintain situational awareness of their port-of-entry or checkpoint environments and to notify CBP personnel of anything suspicious. We understand that, to fulfill this expectation, military personnel would merely report any suspicious activity observed while doing their job. This additional aspect of the duty is expressly authorized by 10 U.S.C. § 271(a), which allows military personnel to provide "any information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law within the jurisdiction of such officials." We think that support provided under chapter 15 would itself be a military operation.

support for civilian law enforcement that is authorized by section 274 is expressly authorized for purposes of the Posse Comitatus Act (although such activities must be done consistent with the regulatory restrictions required by section 275). *See Domestic Terrorism* at 3–5.

Section 274 authorizes DoD to provide support in the form of operating equipment. Section 274(b)(1) authorizes DoD, "upon request from the head of a Federal law enforcement agency, [to] make Department of Defense personnel available to operate equipment" for the purpose of enforcing, among other laws, criminal violations of immigration and customs laws. 10 U.S.C. § 274(b)(1)(A), (b)(4)(A). Section 274(b)(2) requires that such support may be provided only for certain specifically listed purposes, but none of those purposes encompasses the full range of the port-of-entry and checkpoint-observer duties.[16] Section 274(c), however, contains a catch-all provision specifying that military personnel may "operate equipment for purposes other than described in subsection (b)(2)" if "such support does not involve direct participation by such personnel in a civilian law enforcement operation unless such direct participation is otherwise authorized by law."

We think that the port-of-entry and checkpoint-observer duties are authorized by section 274(c). Military personnel would perform these duties by operating CBP electronic equipment in an enclosed location and reporting upon alert messages that may indicate the possibility of unlawful conduct. We understand that CBP personnel use the information gathered in these operations to detect violations of the criminal immigration and customs laws. These duties thus would involve the use of military personnel "to operate equipment" with respect to criminal violations of immigration and customs laws, as authorized by 10 U.S.C. § 274(b)(1)(A). *See also id.* § 274(b)(4)(A) (listing applicable criminal laws).

---

[16] The closest potentially applicable purpose specified in section 274(b)(2) is the "[d]etection, monitoring, and communication of the movement of surface traffic outside of the geographic boundary of the United States and within the United States not to exceed 25 miles of the boundary if the initial detection occurred outside of the boundary." 10 U.S.C. § 274(b)(2)(B). We understand, however, that some of the activity here would not fit within that purpose because it would involve monitoring surface traffic moving well within the boundaries of the United States, and in some instances at checkpoints that are more than 25 miles away from the border.

These activities, moreover, would not "involve direct participation by such personnel in a civilian law enforcement operation." *Id.* § 274(c). We read this language in parallel with the restriction on "direct participation" required under 10 U.S.C. § 275. *See Military Use of Infrared Radars*, 15 Op. O.L.C. at 46. As discussed above, that reference codifies the "direct active participation" test for whether military activity violates the Posse Comitatus Act. *See Domestic Terrorism* at 4; *Electronic Surveillance* at 8; *see also supra* Part I (describing the three tests). The text of section 274(c) is materially similar to section 275 insofar as both bar the military from engaging in "direct participation," either categorically "in a civilian law enforcement operation," 10 U.S.C. § 274(c), or in the slightly more specific "search, seizure, arrest, or other similar activity," *id.* § 275.

We do not think that the port-of-entry and checkpoint-observer duties involve direct participation in a civilian law enforcement operation. As discussed above, the operation of surveillance equipment by military personnel, such as monitoring an infrared radar surveillance system, or operating airborne surveillance equipment, does not itself constitute "direct participation" in civilian law enforcement. *See supra* Part II.B.2. In 2002, for example, we concluded that military personnel may assist an FBI domestic terrorism investigation by piloting an airplane that carried surveillance equipment, operating the surveillance equipment, and transmitting the imagery to the FBI, with FBI personnel responsible for the overall conduct of the investigation, including directing the aircraft to focus on particular targets. *See Domestic Terrorism* at 2, 4. And in 1994, we concluded that military personnel do not engage in direct participation in civilian law enforcement activities in serving "as contemporaneous monitors of electronic surveillance transmissions." *Electronic Surveillance* at 2. We explained that such "remote monitoring through various forms of electronic assistance" was "distinct from such activities as 'planting' the surveillance equipment at the targeted location or carrying a concealed recording device while acting as an undercover agent." *Id.* at 2, 8. As in these instances, the port-of-entry and checkpoint-observer duties would not involve "physical contact with civilians or their property." *Domestic Terrorism* at 4 (quotation marks omitted); *see also Electronic Surveillance* at 8; *Military Use of Infrared Radars*, 15 Op. O.L.C. at 48.

The port-of-entry and checkpoint-observer duties would involve the use of military personnel "to operate equipment" with respect to criminal violations of immigration and customs laws, 10 U.S.C. § 274(b)(1), and would not involve "direct participation" in civilian law enforcement, *id.* § 274(c). Therefore, such assistance is expressly authorized for purposes of the Posse Comitatus Act by section 274.[17]

## IV.

We conclude that neither chapter 15 of title 10 of the United States Code nor section 1059 of the FY 2016 NDAA expressly authorize the rail-support and seal-check activities for purposes of the Posse Comitatus Act, but that neither of those activities would involve the use of the mili-

---

[17] We also think that the port-of-entry and checkpoint-observer duties are consistent with DoD Instruction 3025.21, which codifies the restriction on "direct participation" with more particularized restrictions on "direct civilian law enforcement assistance," *id.* encl. 3, ¶ 1.c. Some of those restrictions simply track the terms contained within 10 U.S.C. § 275, such as "search," and should be construed in the same fashion. Enclosure 3 of this Instruction introduces a new term by restricting DoD personnel from engaging in "surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators." DoD Instruction 3025.21 encl. 3, ¶ 1.c(1)(f). We view this reference to "surveillance" to encompass only the kinds of activities that involve "direct civilian law enforcement assistance," such as the targeting and tracking of specific individuals. The regulation pairs the term "surveillance" with "pursuit," "acting as undercover agents, informants, investigators, or interrogators," and we thus must read "surveillance" to bear a similar meaning to these neighboring words. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (stating that "the principle of noscitur a sociis" counsels that "a word is known by the company it keeps"). If "surveillance" were construed more broadly, then it would prohibit DoD from engaging in activities that are plainly authorized under the regulation, such as the "[d]etection, monitoring, and communication of the movement" of sea, air, and surface traffic near the border. *Id.* encl. 3, ¶ 1.d(5)(b)(1)–(2). Thus, we do not think that either the port-of-entry or checkpoint-observer duties involve impermissible "surveillance" under the regulation.

DoD Instruction 3025.21 also prohibits military personnel from conducting a "search." *Id.* encl. 3, ¶ 1.c(1)(b). As with the regulation's prohibition of "surveillance," we read this portion of the regulations to apply only to a "search" that would constitute "direct civilian law enforcement assistance," which, for reasons noted above, the rail-support and seal-check duties would not involve. While the rail-support and seal-check duties could be said to involve a "search" in some sense, we do not believe that they would involve a "search" as that term is used in this regulation. *See supra* Part II.B.2.

tary "as a posse comitatus or otherwise to execute the laws," 18 U.S.C. § 1385, so as to violate that Act. We further conclude that the port-of-entry and checkpoint-observer activities are expressly authorized by 10 U.S.C. § 274(c).

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*